639 So.2d 1263 (1994)
Ronald Chris FOSTER, a/k/a Ron Chris Foster
v.
STATE of Mississippi.
No. 91-DP-00212.
Supreme Court of Mississippi.
April 28, 1994.
Rehearing Denied August 18, 1994.
*1267 Michael R. Farrow, Farrow Dalrymple & Mitchell, Columbus, James B. Wright, Jr., Blackwell & White, Gulfport, James W. Craig, Jane Tucker Lambert, Jackson, for appellant.
Michael C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, for appellee.
EN BANC.
SMITH, Justice, for the Court:
Ronald Chris Foster was indicted in the Circuit Court of Lowndes County, Mississippi, for the capital murder of George Shelton committed during the course of an armed robbery. The trial court granted Foster's change of venue motion and trial commenced on January 14, 1991, in Lauderdale County. Foster was seventeen years of age at the time of the crime. The jury convicted Foster on January 18, 1991, and following the sentencing *1268 hearing on that same date, imposed the death penalty. Foster has appealed to this Court and asserts twenty-six assignments of error.
ASSIGNMENTS OF ERROR
I.
THE DEATH PENALTY FOR JUVENILES WITHOUT ANY PRIOR CRIMINAL RECORD OR WITHOUT ANY PARTICULARIZED FINDINGS BEING MADE BEFORE BEING TRANSFERRED TO STAND TRIAL AS AN ADULT VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE 3, SECTION 28 OF THE MISSISSIPPI CONSTITUTION.
A. THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION PROHIBIT IMPOSING THE DEATH PENALTY ON A JUVENILE WHO HAS NOT PRIOR CRIMINAL RECORD OR WITHOUT ANY PARTICULARIZED FINDINGS HAVING BEEN MADE.
B. ARTICLE THREE, SECTION 28 OF THE MISSISSIPPI CONSTITUTION PROHIBITS IMPOSING THE DEATH PENALTY ON A JUVENILE WHO HAS NOT PRIOR CRIMINAL RECORD AND WHO HAS RECEIVED NO INDIVIDUALIZED CONSIDERATION.
II.
SECTIONS 43-21-151(1) AND XX-XX-XXX ARE UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS IN THAT THEY DO NOT SET A MINIMUM AGE BELOW WHICH A CHILD MAY NOT BE TRANSFERRED FROM YOUTH COURT TO CIRCUIT COURT FOR CRIMES PUNISHABLE BY LIFE IMPRISONMENT OR DEATH.
III.
THE TRIAL COURT ERRED IN REFUSING TO ALLOW THE DEFENDANT TO QUESTION THE VENIRE ABOUT WHETHER THEY WOULD AUTOMATICALLY VOTE IN FAVOR OF THE DEATH PENALTY IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND MISS. CODE ANN. SECTION 13-5-69.
IV.
THE TRIAL COURT'S AND THE PROSECUTOR'S USE OF AMBIGUOUS LANGUAGE DURING THE DEATH QUALIFICATION OF THE VENIRE WAS IN VIOLATIONS OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND RESULTED IN A JURY PREDISPOSED TOWARDS INFLICTION OF THE DEATH PENALTY.
V.
THE STATE INTENTIONALLY STRUCK BLACK PERSONS FROM THE JURY IN THIS CASE IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
VI.
THE TRIAL COURT ERRED IN ALLOWING THE STATEMENT OF THE DEFENDANT TO BE ADMITTED INTO EVIDENCE IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AS WELL AS ARTICLE THREE, SECTIONS 14 AND 26 OF THE MISSISSIPPI CONSTITUTION.
VII.
THE TRIAL JUDGE'S REMARKS PERTAINING TO RELIGION WERE IN VIOLATION OF THE FIRST AMENDMENTS *1269 ESTABLISHMENT CLAUSE MADE APPLICABLE TO THE STATES BY THE FOURTEENTH AMENDMENT WHICH RESULTED IN AN UNFAIR TRIAL FOR RON CHRIS FOSTER.
VIII.
THE "PECUNIARY GAIN" AGGRAVATING CIRCUMSTANCE WAS APPLIED IN A VAGUE AND OVERBROAD CIRCUMSTANCE WAS APPLIED IN A VAGUE AND OVERBROAD MANNER IN VIOLATION OF MISSISSIPPI LAW AND THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
IX.
THE TRIAL COURT ERRED IN REFUSING TO GRANT DEFENDANT'S JURY INSTRUCTIONS AT THE SENTENCING PHASE WHICH WOULD HAVE PROPERLY DIRECTED THE JURY'S DISCRETION IN DETERMINING WHETHER TO IMPOSE THE DEATH PENALTY.
X.
THE STATE'S SENTENCING INSTRUCTION ALLOWING SENTENCER TO CONSIDER EVIDENCE PRESENTED DURING THE GUILT PHASE ARE INCORRECT STATEMENTS OF LAW AND VIOLATE THE EIGHT AND FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION.
XI.
THE JURY'S SENTENCING DETERMINATION WAS IMPROPERLY PREDICATED ON THE PERSONAL CHARACTERISTICS OF THE VICTIM IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS AND ARTICLE THREE, SECTION 28 OF THE MISSISSIPPI CONSTITUTION.
XII.
THE OTHER CRIMES/BAD EVIDENCE AND ARGUMENT VIOLATED RON CHRIS FOSTER'S RIGHTS UNDER MISSISSIPPI LAW AND THE EIGHTH AND FOURTEENTH AMENDMENTS.
XIII.
THE MITIGATING CIRCUMSTANCE THAT THE DEFENDANT HAS NO SIGNIFICANT HISTORY OF PRIOR CRIMINAL ACTIVITY WAS APPLIED IN AN UNCONSTITUTIONAL MANNER.
XIV.
INTRODUCTION OF INFLAMMATORY PHOTOS OF THE VICTIM WITHOUT EVIDENTIARY PURPOSE OR PROBATIVE VALUE VIOLATED DEFENDANT'S RIGHTS PURSUANT TO MISSISSIPPI LAW AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.
XV.
THE PROSECUTOR'S REQUEST OF JURORS DURING INDIVIDUAL VOIR DIRE TO GIVE CIRCUMSTANCES UNDER WHICH THEY WOULD VOTE TO INFLICT THE DEATH PENALTY VIOLATED THE DEFENDANT'S RIGHTS UNDER MISSISSIPPI LAW AND THE UNITED STATES CONSTITUTION.
XVI.
THE PROSECUTOR'S PLEA BARGAIN WITH VINCENT HARRIS WHICH WAS CONDITIONAL UPON HIS TESTIFYING VIOLATED DEFENDANT'S RIGHTS UNDER MISSISSIPPI LAW AND THE UNITED STATES CONSTITUTION.
XVII.
THE REMARKS OF THE JUDGE TO THE VENIRE THAT THIS WAS A NOTORIOUS *1270 CASE WAS IMPROPER AND RESULTED IN AN UNFAIR TRIAL FOR DEFENDANT IN VIOLATION OF MISSISSIPPI LAW AND THE UNITED STATES CONSTITUTION.
XVIII.
THE TESTIMONY OF THE STATE'S PATHOLOGY WITNESS WAS IMPROPER AND RESULTED IN AN UNFAIR TRIAL FOR DEFENDANT IN VIOLATION OF MISSISSIPPI LAW AND THE UNITED STATES CONSTITUTION.
XIX.
THE PROSECUTOR'S REFERENCE TO DEFENDANT'S ATTEMPT TO KEEP OUT EVIDENCE WAS IMPROPER AND RESULTED IN AN UNFAIR TRIAL FOR DEFENDANT IN VIOLATION OF MISSISSIPPI LAW AND THE UNITED STATES CONSTITUTION.
XX.
THE PROSECUTOR'S REMARK TO THE JURY THAT THE TESTIMONY OF VINCENT HARRIS WAS "CORROBORATED IN EVERY PARTICULAR" WAS AN IMPROPER BOLSTERING THE OTHER TESTIMONY IN VIOLATION OF MISSISSIPPI LAW AND THE UNITED STATES CONSTITUTION.
XXI.
THE DISTRICT ATTORNEY'S COMMENTS ON RON CHRIS FOSTER NOT TESTIFYING VIOLATED THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE THREE, SECTION 25 OF THE MISSISSIPPI CONSTITUTION.
XXII.
THE JUDGE'S ASSISTANCE TO THE DISTRICT ATTORNEY ON SEVERAL OCCASIONS WAS IMPROPER AND RESULTED IN AN UNFAIR TRIAL FOR DEFENDANT IN VIOLATION OF MISSISSIPPI LAW AND THE UNITED STATES CONSTITUTION.
XXIII.
THE INDICTMENT CHARGED DEFENDANT WITH ARMED ROBBERY BUT THE INSTRUCTION TO THE JURY SET OUT A CHARGE OF ROBBERY WHICH VIOLATED DEFENDANT'S RIGHTS UNDER MISSISSIPPI LAW AND THE UNITED STATES CONSTITUTION.
XXIV.
THE JURY DID NOT LIST THE MITIGATING FACTORS WHICH IT FOUND TO BE PRESENT WHICH VIOLATED THE DEFENDANT'S RIGHTS SECURED UNDER MISSISSIPPI LAW AND THE UNITED STATES CONSTITUTION.
XXV.
THE CUMULATIVE ERROR IN THIS CASE REQUIRES THE SENTENCE TO BE REVERSED.
XXVI.
THE DEATH SENTENCE IS DISPROPORTIONATE IN THIS CASE.
In reviewing these assignments we note that Foster failed to raise many of these issues in the lower court or bring them to the court's attention by appropriate timely objection. This Court has repeatedly held that "[i]f no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case." Cole v. State, 525 So.2d 365, 369 (Miss. 1987), cert. denied 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988); Irving v. State, 498 So.2d 305 (Miss. 1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987); Johnson v. State, 477 So.2d 196 (Miss. 1985), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986); In re Hill, 460 So.2d 792 (Miss. 1984); Hill v. State, 432 So.2d 427 (Miss. 1983), cert. denied, 464 U.S. 977, 104 S.Ct. 414, 78 L.Ed.2d 352 (1983).
*1271 Although this Court need not look further after finding a procedural bar, this Court also, alternatively, may review the merits of the underlying claim knowing that any subsequent review will stand on the bar alone. The Fifth Circuit Court of Appeals has addressed this issue in Sawyers v. Collins, 986 F.2d 1493, 1499 (5th Cir.1993), stating:
"On application for the writ of habeas corpus, federal courts will not review a state court's holding on a federal law claim ... if that holding rests upon a state law ground which is both independent of the merits of the federal claim and adequate to support the state court's judgment." Harris v. Reed, 489 U.S. 255, 260-63, 109 S.Ct. 1038, 1042-43, 103 L.Ed.2d 308, 315-18 (1989).
Consequently, "[w]hen a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." Ylst v. Nunnemaker, 501 U.S. 797, 801, 111 S.Ct. 2590, 2593, 115 L.Ed.2d 706 (1991) (citing Wainwright v. Sykes, 433 U.S. 72, 87-88, 97 S.Ct. 2497, 2506-07, 53 L.Ed.2d 594 (1977); Murray v. Carrier, 477 U.S. 478, 485-92, 106 S.Ct. 2639, 2643-48, 91 L.Ed.2d 397 (1986). Furthermore, where a state court finds that a federal claim is procedurally barred, but goes on to reach the merits of that claim in the alternative, the state court's reliance on the procedural default still constitutes an independent and adequate state ground which bars federal habeas review.
Further, the United States Supreme Court in Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), stated:
The mere existence of a basis for a state procedural bar does not deprive this Court of jurisdiction; the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case ...
If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, we, of course, will not undertake to review the decision . ..
An examination of the decision below reveals that it contains no clear or express indication that "separate, adequate, and independent" state-law grounds were the basis for the court's judgment ...
Id. at 327, 105 S.Ct. at 2638-39, 86 L.Ed.2d at 328.
The issues which were not properly raised in the trial court are procedurally barred from consideration by this Court. The remainder we have carefully considered and found to be without merit. This Court affirms Foster's conviction and sentence.

THE FACTS
In the early morning hours of June 10, 1989, Gary Goodwin made his customary stop at the Hankins Superette in Lowndes County, Mississippi, for gas and a cup of coffee. Goodwin was usually greeted at the Superette by George Shelton, the store clerk who worked during the graveyard shift. After filling his truck with gas, Goodwin entered the store and heard a noise which sounded like an electronic tone. He also noticed the cash register was not turned in its usual direction. Seeing no one behind the counter, Goodwin walked toward the coffee pot where he found a cooler, sodas and ice cubes, not yet melted, all over the floor. Beginning to panic, he called out for Shelton, but got no response. Goodwin then looked over the counter where he found the body of George Shelton lying in a pool of blood. Shelton had been fatally shot, the bullet entering the left eye and traveling through the brain to the right rear of the skull. Goodwin called the sheriff's department and waited for the officers to arrive.
Upon investigation, the police discovered shattered glass and a bullet hole behind the counter where the victim was found. A gun kept on the premises and registered to the store's owner was missing. No money had been stolen. From the countertop were recovered several items as evidence, including two TV guides, a building plans magazine, a piece of candy, a granola bar and a piece of cash register tape. A "Gucci" cap lying nearby was also recovered as evidence. Fingerprints lifted from the crime scene were later matched with those taken from the appellant, Ronald Chris Foster.
*1272 After further investigation, Foster became the central suspect in the case. At one point during a meeting of investigators at the sheriff's office, Foster himself called and told the authorities he had information that the Klu Klux Klan was responsible for the murder of George Shelton. The investigators went to the home of Foster's parents, where they arrested Foster and searched the premises. Live rounds of 38-caliber ammunition were discovered in Foster's bedroom.
Vincent Harris and Foster resided in the same neighborhood in Lowndes County. The authorities took the statement of fifteen year old Vincent Harris on July 26, 1989. Harris' statement was that on the evening of June 9, 1989, he and Foster met at a nightclub in Columbus, Mississippi, and began drinking beer. After Harris had consumed about six beers and Foster had consumed twelve, the two went to Foster's home. There Foster told Harris he intended to go to Hankins Superette, place a magazine on the counter, and when the clerk came over to ring up the purchase, jump the counter and rob the cashier. Harris stated he got on the handlebars of a bicycle and Foster began riding the mile and a half to the Superette. Before arriving, Harris jumped off and refused to go further. Foster left, wearing a Gucci cap. Harris waited at the roadside and Foster returned fifteen to thirty minutes later. Foster told Harris he had "shot him." Foster was no longer wearing the cap.
The boys returned to Foster's home where Foster immediately incinerated his bloodstained shirt. He turned over a gun to Harris who gave it to his stepfather two days later. That same evening Foster told Harris that when Shelton came to ring up Foster's purchase, Foster jumped the counter. Shelton pulled out a gun and the two began to wrestle. Foster ordered Shelton to open the cash register and waved the gun around. The gun discharged and Shelton was shot, whereupon Foster fled. The next morning Harris saw Foster again, and Foster then told Harris he shot Shelton for two reasons: Shelton could identify him and Shelton would not open the cash register. As a result of Harris' statements, a loaded 38-caliber gun was retrieved from the trunk of his mother's car.
Foster's own statement to police was that he borrowed a bicycle from a friend, Vincent Harris, and rode it to the Superette at around three o'clock in the morning. According to the statement, George Shelton was outside when Foster arrived and the two walked inside together. Foster took a magazine and went to pay for it and some food items. Two black males were in the store, and one, telling Foster he had a gun, ordered Foster to jump over the counter. Foster complied, but Shelton, thinking Foster was trying to rob him, pulled out a gun from his pants. Foster and Shelton scuffled. Eventually Foster grabbed the gun and ordered Shelton, who was trying to call the police, to put the phone down. Struggling again, Shelton then managed to turn the gun away and was shot. Foster took the gun and went home. A second statement given by Foster differed from the first only in that there was no mention of Shelton's attempting to telephone the police.

DISCUSSION OF LAW
In addressing the issues, those pertaining to the guilt phase will be considered first. Foster's original numbering of the assignments will be retained.

THE GUILT PHASE

III.

THE TRIAL COURT ERRED IN REFUSING TO ALLOW THE DEFENDANT TOM QUESTION THE VENIRE ABOUT WHETHER THEY WOULD AUTOMATICALLY VOTE IN FAVOR OF THE DEATH PENALTY IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE 3, SECTIONS 26 AND 28 OF THE MISSISSIPPI CONSTITUTION AND MISS. CODE ANN. SECTION 13-5-69.
Foster contends that on voir dire he was prevented by the trial court from asking whether members of the venire would automatically vote for the death penalty if they *1273 found Foster guilty of capital murder. Foster refers to the following exchange during voir dire questioning by his counsel:
DEFENSE COUNSEL: ... How many of you believe that if you find Chris guilty beyond a reasonable doubt of capital murder that he should be sentenced to death automatically?
BY THE COURT: That's not the law. I  I'm going to have to interpose my own objection. That is not the law. He will not be  and if you will answer that or ask that question properly I would allow that one also.
DEFENSE COUNSEL: May I approach the bench?
BY THE COURT: You may.
(The attorneys approached the bench, along with the court reporter, and the following occurred out of the hearing of the jurors:)
DEFENSE COUNSEL: Your Honor, I still think I still believe  did you object automatically for him:
BY THE COURT: I objected to you asking them whether or not they felt that the death penalty should be automatic if they found him guilty of capital murder. That is not the law of this state, and I will not allow that particular question.
DEFENSE COUNSEL: So then if I cut off the automatically part?
BY THE COURT: No, I didn't say that. You asked them if they found him guilty of capital murder did they feel that he should automatically get the death penalty. That is not the law of this state, and I will instruct them differently from that so I feel that you are voir diring the jury on matters that  or a matter that is improper. Let's move along. Thank you. You may proceed.
(In the jury's presence, the voir dire continued)
DEFENSE COUNSEL: Thank you, your Honor. Do any of you believe that persons convicted of murder should be executed.
VENIRE: (Number 90, Jean Whaley, raised her hand).
DEFENSE COUNSEL: The question was, do any of you believe that someone convicted of murder should be executed?
BY A JUROR: Do you mean has to be executed?
DEFENSE COUNSEL: No.
BY A JUROR: If there are extenuating circumstances 
DEFENSE COUNSEL: Okay. If you'd like to stand.
BY A JUROR: I'd like to hear the case before I make my decision.
DEFENSE COUNSEL: Thank you, ma'am.
BY A JUROR: 24. It depends on the evidence presented.
Citing Morgan v. Illinois, 504 U.S. ___, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), Foster argues the disallowance of his particular question on whether jurors believed the appellant should be automatically sentenced to death if convicted of capital murder violated his right to be tried by an impartial jury. In Morgan, the members of the jury panel were each asked in some form, whether they could be fair and impartial. Id. at ___, 112 S.Ct. at 2227. However, the trial judge refused the defense counsel's request to ask the question: "If you found Derrick Moore guilty, would you automatically vote to impose the death penalty no matter what the facts are?" Id. at ___, 112 S.Ct. at 2226.
As framed by the United States Supreme Court, the issue on appeal in Morgan was "whether, during voir dire for a capital offense, a state trial court may, consistent with the Due Process Clause of the Fourteenth Amendment, refuse inquiry into whether a potential juror would automatically impose the death penalty upon conviction of the defendant." Id. at ___, 112 S.Ct. at 2225. In deciding the trial court's voir dire was insufficient to identify jurors who could not be impartial due to their views requiring them to vote automatically in favor of the death penalty, the Court noted the issue was the reverse of that first presented in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Through Witherspoon and its progeny, it is the rule that a juror who would never vote for the death *1274 penalty no matter what instructions of law he or she received, is not impartial and must be removed. Wainwright v. Witt, 469 U.S. 412, 423, 105 S.Ct. 844, 851-52, 83 L.Ed.2d 841 (1985); Adams v. Texas, 448 U.S. 38, 40, 100 S.Ct. 2521, 2524, 65 L.Ed.2d 581 (1980).
In Morgan, the Court concluded that just as the State must be given the opportunity to identify and remove jurors who were unable, due to personal opposition to capital punishment, to impose the death penalty, a defendant must similarly be allowed, through voir dire, to locate and eliminate jurors who were equally strongly committed to imposing the death penalty. The Court stated:
We deal here with petitioner's ability to exercise intelligently his complementary challenge for cause against those biased persons on the venire who as jurors would unwaveringly impose death after a finding of guilt. Were voir dire not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would always impose death following conviction, his right not to be tried by such jurors would be rendered as nugatory and meaningless as the State's right, in the absence of questioning, to strike those who would never do so.
504 U.S. at ___, 112 S.Ct. at 2232.
While recognizing that Morgan provides that it is a violation of a defendant's due process rights to prevent him, in a capital case, from inquiring whether prospective jurors would automatically impose the death penalty upon a conviction, it remains clear that "[v]oir dire `is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" Morgan v. Illinois, 504 U.S. at ___, 112 S.Ct. at 2230, citing Ristaino v. Ross, 424 U.S. 589, 594, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976) (quoting Connors v. United States, 158 U.S. 408, 413, 15 S.Ct. 951, 953, 39 L.Ed. 1033 (1895)).
In the most significant aspect of this issue, a review of the entire voir dire proceeding does not indicate that Foster was denied the right to interrogate the venire on the issue of the death penalty. Foster's counsel attempted to ask jurors whether they believed Foster should be automatically sentenced to death upon a conviction. The trial judge refused to allow the question as phrased since it was an incorrect statement of the law which had the potential to confuse the jury with the law as later correctly instructed by the court. See Miss. Code Ann. Section 99-19-101 (Supp. 1992).
The trial judge specifically advised Foster's counsel that if he would ask his question in a properly worded manner, it would be allowed. Foster's counsel inquired of the trial judge, would it be proper, "if I cut off the automatic part?" Judge Howard's response of, "No, I did not say that," should have clearly alerted counsel to the judge's obvious concern that the question again failed to include as a part of counsel's proposed jury question, the additional language that jurors should consider the facts in evidence and follow the law. The judge's response absolutely indicates the use of the word "automatically" was appropriate within the phrased question, and would certainly not be prohibited by the trial judge in a properly rephrased question to the jury.
Rather than asking the venire directly whether any of them would automatically vote to impose the death penalty, regardless of the facts or law, if Foster were already convicted, counsel chose to ask "do any of you believe that persons convicted of murder should be executed?" Foster's counsel, in his rephrased version of his original question to jurors, elected to leave out the word "automatically." He also substituted the term murder for capital murder in his rephrased question.
Foster's counsel immediately received juror responses to his rephrased question. Juror 90, Jean Whaley, simply raised her hand. While the record lends no insight into this action, it does make clear that Foster's counsel never followed up on this juror's "response". No additional questions were asked of this juror by the State or the trial court. Neither side moved to strike her for cause, or utilize a peremptory strike. The record clearly indicates that as to challenges for cause, there were no strikes made past Juror No. 75. Peremptory challenges ended at *1275 Juror No. 49. Juror Whaley, as Juror No. 90, was never further considered as a juror.
Another juror responded: "I don't understand what you say murder." To which the trial judge responded: "That's a good point." It should be noted that Foster's counsel utilized capital murder in his initial question but, said only "murder" in his rephrased version. The next juror response was: "Do you mean has to be executed?" Foster's counsel responded, "No." By this response, Foster's counsel clearly negated his own attempt to illicit responses from jurors who would automatically vote for death once Foster had been found guilty, the very point of the entire line of questioning. At the very least, Foster's counsel's remark of "No" was potentially confusing to the jury, which incidentally, was the main concern of the trial judge. Juror 93 then responded, "If there are extenuating circumstances  I'd like to hear the case before I make my decision." Juror 24 responded: "It depends on the evidence presented." All juror responses indicated that they were not confused, but rather comprehended that they were being asked  if having found Foster guilty, would they "automatically" sentence Foster to death.
These initial responses of jurors to the rephrased question of Foster's counsel, coupled with the subsequent questioning of the venire by counsel for Foster, the State and the trial court, unequivocally establish that no juror was improperly excluded or included by the trial court in this case. No juror stated that he or she would impose death after a guilty verdict, regardless of the facts and circumstances of conviction, nor fail to follow the dictates of the law.
We find that Foster was not denied the opportunity, and in fact did question the venire members about their views on the death penalty and whether it should be imposed in the event of a murder conviction. The fact that counsel for Foster chose not to rephrase his question to inquire whether the venirepersons would automatically impose the death penalty if Foster was convicted is no ground for reversal under the differing facts of Morgan.
It is most significant to note at this point that the procedure by which voir dire was conducted in Morgan is markedly different from that involved in the case sub judice. In the former case, counsel submitted proposed questions for the venire to the trial judge, who could allow or deny them, and it was the trial judge himself who would then propound the questions to the potential jurors. The trial judge in Morgan made the fatal decision to disallow counsel's question on whether jurors would automatically vote in favor of the death penalty, believing he had already asked a sufficiently similar question. Contrary to Morgan's counsel, Foster's counsel had the opportunity to choose and form his own questions, and, by gauging responses from the venire, could freely rephrase or ask follow-up questions where the responses were insufficient or indicated the jurors were confused. The record simply does not support that Foster's counsel was denied any opportunity to question the venire in a manner of his own choosing, with the only proviso that he not mislead them with incorrect statements of the law.
In Morgan, the United States Supreme Court obviously was concerned about a juror's inability to consider the facts and follow the law. Therein, jurors were each asked in general could they be fair and impartial and appropriate responses were given by all. However, the trial judge failed to specifically ask three jurors, "Would you follow my instructions on the law, even though you may not agree?" Morgan, 504 U.S. at ___, 112 S.Ct. at 2226. The Court emphatically noted that "[a]ny juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law." Id. at ___, 112 S.Ct. at 2233. See Turner, 476 U.S. at 34-35, 106 S.Ct. at 1687-88, 90 L.Ed.2d at 35-36. (White, J., plurality opinion). The Morgan Court continued:
But such jurors obviously deem mitigating evidence to be irrelevant to their decision to impose the death penalty: they not only refuse to give such evidence any weight but are also plainly saying that mitigating evidence is not worth their consideration and that they will not consider it.
Id. In the case sub judice, the jurors were properly voir dired on considering the facts and following the law including the critical *1276 issue of being able to balance aggravators against mitigators in considering a death penalty, after a finding of guilt of capital murder. Again contrary to Morgan, the entire jury venire in the case at bar was properly instructed on following the law by the trial judge.
The Wainwright standard for challenging jurors on death penalty views was adopted by this Court in Fuselier v. State, 468 So.2d 45 (Miss. 1985). This standard has been followed to the present in our death penalty jurisprudence. Hansen v. State, 592 So.2d 114 (Miss. 1991); Turner v. State, 573 So.2d 657 (Miss. 1990); Woodward v. State, 533 So.2d 418 (Miss. 1988). It is clear from a review of the entire voir dire that Foster's counsel was allowed to fully question all jurors on the venire. It is equally clear that the entire voir dire was conducted by the trial court in accordance with Hansen.
Examination of the general voir dire of the entire venire shows that the jury was well aware that the death sentence was not automatic and that they would not be required to impose a sentence of death on Foster. During questioning by District Attorney Allgood, we find the following:
BY MR. ALLGOOD: All right. Do you also all understand that just because you find this man guilty of capital murder that does not mean that automatically he gets the death penalty; that you are the final person who says that, you, being the twelve people who are finally selected to hear this case: Do you all understand that? If you don't, would you raise your hand?
(NO RESPONSE)
Q. Now knowing what you do, knowing as you do, the procedure that we follow obviously the path of least resistance would be to find the man not guilty of capital murder and then you don't have to worry about the relatively tough issue of what type of sentence to be imposed.
Q. Now you  you have all indicated that you can follow for the most part the Court's instructions. I anticipate that there will be one instruction which will tell you that if we get to the sentencing phase of this trial, the phase that is concerned with the sentence to be given to the defendant, that you're supposed to engage in a balancing type of procedure, that is, you are to weigh the aggravating circumstances, the circumstances which show that this man should receive the death penalty, against the mitigating circumstances, that is the factors which show that he should receive a lesser sentence, that you are to weigh those particular circumstances and that if you find that the aggravating circumstances outweigh those mitigating ones that you can return a verdict of death.
In reviewing a voir dire question of Foster's counsel we find the following:
BY MR. CUNNINGHAM: Do each and every one of you understand that if eleven of you are saying that he should get the death penalty and one of you says that he should get life that the judge then would have to sentence the defendant, Chris Foster, to life imprisonment?
The record indicates there was also no response from any juror to the above stated question. It is clear from these questions posed to the entire jury venire, that the venire was absolutely aware that a death sentence in Foster's case was not automatic; that the jurors were never required to impose the death penalty; that a finding of guilt of murder rather than capital murder would totally absolve the jury from having to consider the tough issue of what sentence they should impose; and that if they found Foster guilty of capital murder, they would then proceed through a separate sentencing hearing to weigh aggravating circumstances against mitigating circumstances in a balancing test to determine whether to impose life or death as Foster's sentence.
Finally, it is the objective of these questions concerning a juror's views on capital punishment to identify those individuals who had predetermined that the death penalty would be imposed should the appellant be convicted, and to thereby effectuate their removal as being impermissibly predisposed. As the Morgan Court clearly stated, "the belief that death should be imposed ipso facto upon conviction of a capital offense *1277 reflects directly on that individual's inability to follow the law." Morgan, 504 U.S. at ___, 112 S.Ct. at 2233.
The overall objective of Witherspoon and the subsequent line of authority thereafter, Wainwright, Adams, and Morgan is to not allow jurors to serve who are steadfastly determined to vote for or against the death penalty despite the facts in evidence and the law on which they are instructed. The Fifth Circuit Court of Appeals in Smith v. Balkcom, 660 F.2d 573, 578 (5th Cir.1981), modified, 671 F.2d 858, cert. denied, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982), stated:
All veniremen are potentially biased. The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to either side of the case. Clearly, the extremes must be eliminated  i.e., those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence.
In the final and most important analysis, it is obvious from the response of the venire to the inquiry which Foster did undertake, that there was no person who could be said to be "unalterably in favor of ... the death penalty in every case." Morgan, 504 U.S. at ___, 112 S.Ct. at 2233. Without exception the "extremes" on the venire were eliminated. All jurors excluded for cause clearly were properly excluded under the test set forth in Wainwright. Foster's counsel even agreed with two of the strikes for cause made by the State. Foster only mentioned one juror by name, No. 45, Ada Marie Brown, and he did so in a footnote. Ms. Brown was not among the jurors from which the actual twelve trial jurors were chosen. Regardless, Ms. Brown was clearly excludable under Wainwright according to her responses during voir dire. There was no error in the exclusion of jurors peremptorily challenged. The remaining jurors' responses clearly indicated that each juror had the ability to be impartial.
Foster's counsel was not precluded by the trial judge from using the word "automatically" in rephrasing his voir dire questions to conform to the law. In fact, the judge expressly informed counsel that the use of the word "automatically" was not the problem. The trial judge's only objection was that the question asked of the venire was contrary to the law of this state and was potentially misleading to the jury who would be instructed otherwise. Asking jurors their perception or opinion of what the law should be, rather than determining their predisposition under the law as it exists, is the subtle distinction the judge was pointing out. Since the latter is precisely the objective of questioning the venire regarding the death penalty, we conclude there was no error in having counsel rephrase his question to that end. Above all, we find that no prejudice resulted from the trial judge's decision. This assignment of error, upon due consideration, is rejected.

IV.

THE TRIAL COURT'S AND THE PROSECUTOR'S USE OF AMBIGUOUS LANGUAGE DURING THE DEATH QUALIFICATION OF THE VENIRE WAS IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND RESULTED IN A JURY PREDISPOSED TOWARDS INFLICTION OF THE DEATH PENALTY.
Foster contends duplicative questioning by the prosecution and the trial judge led to the removal for cause of several jurors who were not predisposed against the imposition of the death penalty, but who had merely expressed general reservations on capital punishment. Foster asserts that the questioning left jurors operating under the mistaken impression that the law, in some instances, required the jury to return a vote for death. Finally, Foster contends that neither the trial court nor the prosecution explained that the law would never mandate that a jury impose the death penalty, thereby leaving their erroneous beliefs uncorrected.
The standard for excluding jurors based on their views on the death penalty was set forth by the United States Supreme Court in Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851 (1984), and recognized by this Court in Fuselier v. *1278 State, 468 So.2d 45 (Miss. 1985). This Court stated:
That rule, succinctly stated, is that "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." (cite omitted). The juror must be able to consider and decide the facts impartially and conscientiously apply the law.
Id. at 53-54.
Foster raises no objection to the voir dire of any particular juror, but objects to the questioning by the prosecution and the trial court in general. A review of the proceedings before the venire indicates the prosecution clearly informed the venire that the death penalty was not required in the event of a conviction. The prosecution received no response when he asked of the venire, "Do you also all understand that just because you find this man guilty of capital murder that does not mean that automatically he gets the death penalty ... Do you all understand that?"
Jurors who expressed general reservations against capital punishment were subjected to individual voir dire so that their specific views could be more fully explained. As Foster all but acknowledges in his brief to this Court, such in-depth questioning is necessary since "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Morgan v. Illinois, 504 U.S. at ___, 112 S.Ct. at 2231. Accord Willie v. State, 585 So.2d 660, 672-73 (Miss. 1991). A closer examination of the type of questions asked of jurors by the State upon individual voir dire fails to support Foster's argument. Each juror was asked some variation of the questions propounded Juror # 74, for instance, who was questioned as follows:
BY THE STATE: Now if you're selected on a capital case, and you're in that guilt phase, in the portion of the trial where you're deciding whether or not he's guilty or innocent, and you know that if you vote guilty then you're fixing to have to decide whether or not he should live or die, is that going to affect your decision on whether or not he's guilty or not? In other words, is that going to impair your judgment on that guilt phase?
JUROR # 74: No.
BY THE STATE: Okay. Now that's the  that's the first level. Here's the second level. The second level is now you're at the sentencing part of the trial, and the judge gives you an instruction, and the judge says, "You're to weigh the bad stuff or what we call the aggravating circumstances against the good stuff or what we call the mitigating circumstances, and if the bad outweighs the good, then you can return a verdict of death." Now my question is, can you follow that instruction?
JUROR # 74: Yes.
We disagree that the questions directed to jurors who had expressed reservations against or whose opinions were left uncertain regarding the death penalty were misleading or otherwise problematic. They were certainly permissible as designed to identify those jurors whose views would substantially impair their ability to serve as jurors. Wainwright v. Witt, 469 U.S. at 424, 105 S.Ct. at 852, 83 L.Ed.2d at 851 (1984). This Court, in keeping with Wainwright, has previously upheld the removal of jurors who gave "inconsistent answers with regard to their ability to return a death sentence." Pinkney v. State, 538 So.2d 329, 345 (Miss. 1988). This Court has determined a trial court did not err in removing "those jurors whose position on the death penalty was not unmistakably clear." Id. at 344. Only through an adequate voir dire can either the State or the defense determine a juror's position on the death penalty. We find the questioning of these jurors was acceptable.
This assignment is rejected as being without merit.

V. THE STATE INTENTIONALLY STRUCK BLACK PERSONS FROM THE JURY IN THIS CASE IN VIOLATION OF THE SIXTH AND FOURTEENTH *1279 AMENDMENTS TO THE UNITED STATES CONSTITUTION.
Foster next presents his Batson claim. See Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Foster is an African American, and the record indicates the State used six of its peremptory challenges to remove black males from the venire. Four additional challenges by the State were used to strike four white males, and the State's two final challenges remained unused. The jury which tried Foster was composed of nine whites and three blacks.
Foster's only objection to the State's use of peremptory challenges during the jury selection proceedings was as follows:
BY THE DEFENSE: The prosecution making six out of ten strikes were blacks [sic], it shows that he's established a pattern of striking black jurors unconstitutionally, and we'd move to quash the whole venire under Batson  under the authority of Batson, and other applicable federal law and the U.S. Constitution and Mississippi Constitution 
Although the trial court determined that Foster had failed to make out the required prima facie case of purposeful discrimination under Batson, he nonetheless required the State to offer their race-neutral reasons for challenges against black jurors. In examining the record, we find that the State articulated race-neutral reasons sufficient to uphold the trial judge's determination. Foster failed to offer any proof in rebuttal to the reasons offered by the State. The record shows the State's six challenges against black jurors and the reasons given therefore as follows:
S-1. Frank Lee Nixon: Mr. Nixon states on his questionnaire that he was a juror at some point in time, but he couldn't remember when it was or what the case was. Mr. Nixon stated that he had not come to a full conclusion about the death penalty ... Additionally, your Honor, he has been investigated for murder here in Lauderdale County according to the Meridian Police Department and the Lauderdale County Sheriff's Department.
S-2. Willie Hopson: Mr. Hopson, most of his entire family has been convicted according to our jury research down here. The people in the DA's office and the worthless check unit and what have you reacted very strongly to him when I asked them about him. They were very familiar with him and with the Hopson family as a whole. Additionally, Mr. Bill Hartiz [sic] who is one of the Bailiffs in the courtroom, when I asked him about this juror, said that the Hopsons were all or had all been in trouble, and a Mrs. Doris Avara who was a relative of the victim . .. likewise knew of the Hopson's family reputation for being trouble makers, being disruptive....
S-3. William Neal, Jr.: Mr. Neal is an alcoholic, according to the people in the worthless check unit upstairs at the district attorney's office. He spoke very slowly, he did shake when he was talking. I had intended  I thought there was something wrong with the man and I had intended to strike him ... because of his demeanor. However, additionally, he has no employment; he is unemployed. He has a residence at 2100 31st Avenue which I am told ... that is an extremely tough neighborhood, an extremely bad neighborhood.
S-7. Percy Hudson: He stated that he was against the death penalty on his questionnaire; he equivocated on his  his responses. Additionally, my information is Mr. Hudson has been convicted of a felony; that being the felony of robbery. Uh, we were unable to locate that conviction in Lauderdale County; however the Meridian Police Department and the Lauderdale County Sheriff's Department say he is convicted. He may very well be convicted in ... some other jurisdiction, including the federal jurisdiction. And likewise, the DA's office employees knew Mr. Hudson and stated that he was not a very credible individual.
S-9. Isaac Washington: If the court will recall, Mr. Washington was one that I had originally brought to the attention of the court as possibly being the individual who was convicted of  of child molestation, and we presented that file to the court. The individual in that particular case was 60 years old; this individual was 34, so obviously *1280 it was not the same one; however, in talking with some of the local law enforcement people ... they are certain this man is conn  connected by blood to this individual, that being he's the son.... Likewise, your Honor, his employment ... he works as a  garbage pickup. That was his employment and his education level is  is extremely low....
S-10. Charles Holloway: He stated on his form that he was against the death penalty. He  his appearance  was uh  Judge, I don't know any  any polite way to put it. Uh, he had lots of gold chains and pendants and things of that nature on him. Likewise, his demeanor was such that I did not feel that he was being perfectly honest with us when we asked him questions ... about his death qualifications. I felt like he equivocated on  to those answers. He is presently maintaining a suit against the City of Meridian, and has been a thorn in the flesh of the law enforcement around here for a considerable amount of time. He is apparently quite the gadfly. He runs a lounge and I did not feel that he was the type of juror that would, uh, be what would qualify as a, quote, "solid citizen," unquote, because of all these particular reasons.
Thereafter, the trial judge reiterated that he had requested the State explain its use of peremptory challenges only for "purposes of review both by [himself] and the Supreme Court, should that become necessary." We find implicit in his statements a determination that the reasons given by the State were sufficiently race-neutral and from there we proceed in our review.
In Lockett v. State, 517 So.2d 1346 (Miss. 1987), this Court presented a list of reasons accepted as race neutral by other courts in an effort to provide guidance on this issue to the trial judges in this state. Id. at 1353. Among those reasons can be found: involvement in criminal activity, unemployment, employment history, relative of juror involved in crime, low income occupation, juror wore gold chains, rings and watch, dress and demeanor. In the case sub judice, after reviewing the reasons given for the State's challenges, we simply cannot say that any one of the challenges was not supported by a legitimate, race-neutral explanation. Coupled with the fact that our review is made all the more difficult by Foster's failure to offer any evidence whatsoever in rebuttal, we find that this assignment of error fails.
This assignment of error is rejected as being without merit.

VI. THE TRIAL COURT ERRED IN ALLOWING THE STATEMENT OF THE DEFENDANT TO BE ADMITTED INTO EVIDENCE IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AS WELL AS ARTICLE THREE, SECTIONS 14 AND 26 OF THE MISSISSIPPI CONSTITUTION.
Foster here contends allowing his statement to the police into evidence constitutes reversible error in view of the fact that there was no inquiry first into such relevant factors as his education, intelligence, background, experience with the criminal justice system, and, particularly, his age. Without such an inquiry, Foster asserts, there was no showing that his statement was given freely and voluntarily.
The United States Supreme Court in Fare v. Michael C., 442 U.S. 707, 725-26, 99 S.Ct. 2560, 2571-72, 61 L.Ed.2d 197, 212-13 (1979) held that whether a statement made by a juvenile during custodial interrogation is admissible necessitates an inquiry into the totality of the circumstances. The Court stated:
This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits  indeed, it mandates  inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment *1281 rights, and the consequences of waiving those rights. (cite omitted).
Id.
A suppression hearing was held to determine the admissibility of statements given by Foster to the police during his interrogation. The trial court heard evidence from Foster that he was seventeen years old at the time of his arrest and interrogation, that he had an eighth grade education, that his parents were uneducated and that he had suffered head injuries as a young child which allegedly caused some impairment of his mental faculties at times. Foster testified at the suppression hearing that he did not understand the warnings he was given prior to being interrogated.
The trial court also heard from the two arresting officers that Foster was read his Miranda rights at least twice before any interrogation. Foster was asked whether he understood those rights and responded that he did. He was also asked whether he had any trouble reading or writing and he stated he did not. Before Foster gave his taped statement, an officer read him the form declaring the waiver of his rights and asked Foster if he understood the waiver. Foster responded he understood the waiver. The two officers who questioned Foster testified that they made no promises or threats nor did they coerce, intimidate or beat Foster. One officer testified that Foster was cooperative and did not appear to be afraid. The State offered into evidence Foster's tape recorded confession, a transcript of the taped confession and a handwritten version of the confession with Foster's signature.
At the conclusion of the suppression hearing, the trial judge stated:
BY THE COURT: I have read all of the exhibits tendered into evidence. When a motion to suppress statements or a statement is filed alleging violation of a defendant's constitutional, both state and federal rights, the burden of proof devolved upon the State to prove to the Court's satisfaction beyond a reasonable doubt that the statements [sic] that is given were freely and voluntarily given after a knowing and intelligent waiver of those federal and state constitutional rights. The Court sits as both the finder of fact and law in motions to suppress. In this particular case, after hearing all of the evidence and testimony elicited and after observing the witnesses testify and observing their conduct in the courtroom during the course of this hearing, finds that the State has met its burden of proof, that is, the Court finds affirmatively from the evidence that the statements were freely and voluntarily given to the officers after a knowing and intelligent waiver of the constitutional rights afforded this defendant as is afforded any defendant. The motion to suppress these statements will be overruled.
It is clear from the findings by the trial judge that he applied the correct standard in determining, "after hearing all of the evidence and testimony elicited," that Foster's confession was given voluntarily and with a knowing and intelligent waiver of his privilege against self-incrimination. Jones v. State, 461 So.2d 686 (Miss. 1984); Frost v. State, 483 So.2d 1345 (Miss. 1986). "Such findings are treated as findings of fact made by a trial judge sitting without a jury as in any other context. As long as the trial judge applied the correct legal standards, his decision will not be reversed on appeal unless it is manifestly in error, or is contrary to the overwhelming weight of the evidence." Davis v. State, 551 So.2d 165, 169 (Miss. 1989), citing Frost v. State, 483 So.2d at 1350; White v. State, 495 So.2d 1346, 1347 (Miss. 1986).
We find that the trial court's determination of the admissibility of Foster's statement was neither manifestly in error or contrary to the overwhelming weight of the evidence. This assignment is without merit and is rejected.

VII.

THE TRIAL JUDGE'S REMARKS PERTAINING TO RELIGION WERE IN VIOLATION OF THE FIRST AMENDMENT'S ESTABLISHMENT CLAUSE MADE APPLICABLE TO THE STATES BY THE FOURTEENTH AMENDMENT WHICH RESULTED IN AN UNFAIR TRIAL FOR RONALD CHRIS FOSTER.
*1282 Foster contends the trial court twice violated the provision of the First Amendment against the making of any law "respecting an establishment of religion, or prohibiting the free exercise thereof ..." U.S. Const. Amend. I. First, Foster complains of questioning of a venireman by the trial judge during voir dire. Although the judge at one point did state "that the law I will instruct you [venireperson # 18] on will not conflict in any way with [H]is law at all," the judge then added that the juror's "interpretation of ... God's law may be different than what I instruct you." Second, Foster objects to the judge's requesting a moment of silence in honor of the troops serving in the Persian Gulf prior to the beginning of proceedings one morning.
It is clear from a review of the entire voir dire by the trial judge that his questions of venireperson # 18 were directed toward whether or not that individual could follow the law as he was instructed or whether his religious views would substantially impair his performance as a juror. We are of the opinion that neither the voir dire of this prospective juror nor the moment of silence was sufficient to prove a violation of the Establishment Clause under the applicable test as articulated by the United States Supreme Court in Edwards v. Aguillard, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).
The record contains no objection by Foster at trial to either of these alleged violations of the First Amendment which he now seeks to raise before this Court. See Cole v. State, 525 So.2d 365 (Miss. 1987), cert. denied, 488 U.S. 934, 109 S.Ct. 330, 102 L.Ed.2d 348 (1988). This assignment is rejected as being both procedurally barred and without merit.

XII.

THE OTHER CRIMES/BAD ACTS EVIDENCE AND ARGUMENT VIOLATED RON CHRIS FOSTER'S RIGHTS UNDER MISSISSIPPI LAW AND THE EIGHTH AND FOURTEENTH AMENDMENTS.
The appellant contends that multiple references to a pizza allegedly stolen by Foster were irrelevant, prejudicial and constituted reversible error. Foster refers to testimony by Vincent Harris during direct examination by the State, whereupon Harris was asked whether he was arrested in connection with the murder of Shelton on July 26, 1989. Harris replied, "Well we was a  arrested for something else. Well Chris [Foster] had  we was arrested and, uh, Chris stole the pizza and I was wid [sic] him ." Counsel for Foster objected and the trial court sustained the objection.
The State did not linger on Harris' reply and did not again reference the alleged stolen pizza. Indeed, the record shows when counsel for Foster questioned Harris on four more occasions concerning the pizza, it was the State which objected to the reference. Before this Court Foster's counsel now contends Harris' unresponsive reply unduly burdened Foster by implying that he may have been involved in another, unrelated crime. The cases cited by Foster are easily distinguished from the situation here since they involved testimony of bad acts or other crimes intentionally elicited or presented by the prosecution. See Elmore v. State, 510 So.2d 127, 130 (Miss. 1987); Smith v. State, 499 So.2d 750, 756 (Miss. 1986); West v. State, 463 So.2d 1048, 1052 (Miss. 1985).
Foster neither requested that the trial court admonish the jury to disregard the testimony, nor requested a mistrial. His only objection was sustained. We are of the opinion that any error created by Harris' unresponsive remark was effectively cured when the trial judge sustained Foster's objection. Bullock v. State, 391 So.2d 601, 609 (Miss. 1980), cert. denied 452 U.S. 931, 101 S.Ct. 3068, 69 L.Ed.2d 432 (1981); Holifield v. State, 275 So.2d 851 (Miss. 1973).
This assignment is rejected.

XIV.

INTRODUCTION OF INFLAMMATORY PHOTOGRAPHS OF THE VICTIM WITHOUT EVIDENTIARY PURPOSE OR PROBATIVE VALUE VIOLATED FOSTER'S RIGHTS UNDER MISSISSIPPI LAW AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.
*1283 Foster appeals the admissibility of three photos of the victim's body: one, a representation of Shelton's chest and head as found by police at the scene; two, a more distant shot of the same portion of the body which includes a sizable accumulation of blood and other body fluids on the floor of the store; and finally a photo of a cut on Shelton's left forearm.
Foster claims the photos were "[g]ruesome, inflammatory photographs that lack an evidentiary purpose" and, as such, were not admissible, citing McNeal v. State, 551 So.2d 151 (Miss. 1989). Foster claims that even if the photos were relevant, their prejudicial value outweighed their probative value. Id., citing Kniep v. State, 525 So.2d 385, 388 (Miss. 1988).
In McNeal v. State, 551 So.2d at 159, this Court reversed a conviction for murder after the trial court admitted color prints of a close-up, decomposed and maggot-infested skull of the victim. The State claimed that the photos were necessary to prove the corpus delicti. Id. This Court responded that the probative value of the photos' was outweighed by their prejudicial effect. Id. While the photos of the corpse in the instant case  as would be the photos of any corpse  may be difficult to view, they do not reach the inflammatory effect of a McNeal photo.
Similarly, Foster alleges the photos were inadmissible under Kniep v. State, 525 So.2d 385, 388 (Miss. 1988). In Kniep, photos of the decedent taken at the hospital came into evidence as there was an issue of fact for the jury as to whether the cause of death was exsanguination or alcohol poisoning. Id. The opinion is silent as to the details of the photos other than to say they depicted "surface" injuries. Id. In the case sub judice, Exhibit 25 showed wounds to the victim's face, and Exhibit 26 showed the victim's glasses on the floor. The trial court's ruling inter alia, found the "photographs were not unduly prejudicial and that they are supported by the evidence and testimony of the witnesses who have testified so far, and are necessary to give a fair rendition of the wounds, position and location...." Without more detail, we can neither analogize nor discriminate the photos in the instant case from those tendered to the jury in Kniep.
This Court, on review of the photos, finds that they neither match nor exceed the McNeal standard for prejudicial effect. The photographs were already in evidence at the guilt phase and were properly readmitted into evidence at the sentencing phase of the trial. We find no merit to this assignment of error by Foster.

XV.

THE PROSECUTOR'S REQUEST OF JURORS DURING INDIVIDUAL VOIR DIRE TO GIVE CIRCUMSTANCES UNDER WHICH THEY WOULD VOTE TO INFLICT THE DEATH PENALTY VIOLATED DEFENDANT'S RIGHTS UNDER MISSISSIPPI LAW AND THE UNITED STATE CONSTITUTION.
Foster contends that the State during individual voir dire impermissibly questioned members of the venire by asking them for the particular circumstances that each would require in order to return a death sentence. The questioning, Foster argues, was designed to secure a commitment from jurors to vote for the death penalty upon the finding of a certain set of circumstances. Foster complains of three instances where veniremen were asked in some form "what circumstances would you demand to be shown before you would ever return a verdict of death?"
First, it is noted that Rule 5.02 of the Mississippi Uniform Criminal Rules of Circuit Court Practice and the cases Foster cites in his favor stand for the general rule that it is "reversible error to ask a juror during voir dire to commit to returning a particular verdict." Stringer v. State, 500 So.2d 928, 938 (Miss. 1986); Miss.Unif.Cr. R.Cir.Prac. 5.02. We find that the complained of questions were not designed to extract a promise from these jurors, under oath, that they would certainly vote for the death penalty given a specific set of circumstances. Individual voir dire was held with those members of the venire who had expressed opposition to or uncertainty regarding the death penalty. As to the proper *1284 limitations of such voir dire, this Court has stated:
The district attorney has the right in a capital case to reasonably satisfy himself that no juror who entertains conscientious scruples against the death penalty shall remain on a jury, even though the juror may have passed the examination by the judge; and he may to a reasonable length search further into that inquiry. But in so doing he must not go to the extent of forcing what is in the nature of a committal as to what the juror or jury would do in that particular case, nor shall the examination be of such character as to introduce or create the impression that a juror will rest under the frown of official displeasure unless he returns a death verdict.
Murphy v. State, 246 So.2d 920, 921 (Miss. 1971).
We find nothing improper in the complained of questions and would further note that, as a result thereof, each of the three veniremen in question were peremptorily excused by the State. There is no indication of an unconstitutionally impaneled jury. This assignment is rejected as being without merit.

XVI.

THE PROSECUTOR'S PLEA BARGAIN WITH VINCENT HARRIS WHICH WAS CONDITIONAL UPON HIS TESTIFYING VIOLATED DEFENDANT'S RIGHTS UNDER MISSISSIPPI LAW AND THE UNITED STATES CONSTITUTION.
Vincent Harris was indicted as a codefendant with Foster for capital murder, but was allowed to plead guilty to being an accessory after the fact in exchange for his testimony at Foster's trial. Foster contends that while plea bargains in general are allowed, the State may not condition acceptance of a plea until an accomplice performs "correctly" at the trial of his codefendant. In this case, Foster notes the reduction in Vincent Harris' sentence was not scheduled to occur until after the trial of Foster, and Harris' testimony therein, had concluded.
"It is well established in our jurisprudence that an accused may be convicted on the uncorroborated testimony of an accomplice." Culberson v. State, 379 So.2d 499 (Miss. 1979); Rich v. State, 322 So.2d 468 (Miss. 1975); Moore v. State, 291 So.2d 187 (Miss. 1974); Young v. State, 212 Miss. 460, 54 So.2d 671 (1951). However, citing Burns v. State, 96 Nev. 802, 618 P.2d 881, 884 (1980), Foster contends Harris' testimony in the present case was "irreparably tainted." In Burns, the Nevada Supreme Court determined that the State, in dismissing charges of attempted murder only after the completion of a codefendant's testimony, violated the rule against such a practice as stated in Franklin v. State, 94 Nev. 220, 577 P.2d 860 (1978). The Court in Franklin held that by "bargaining for specific testimony to implicate a defendant, and withholding the benefits of the bargain until after the witness has performed, the prosecution becomes committed to a theory quite possibly inconsistent with the truth and the search for the truth." Id. 577 P.2d at 863. In a concurring opinion in Burns, Justice Manoukian stated:
Although I concur in the result of the opinion of the court, I disagree that the prosecutorial tactics involving the plea bargaining with the defendant, Chism, violated his codefendant's right to due process. I would not assign error to that issue.
First, I believe that Franklin, a near carbon copy of People v. Medina, 41 Cal. App.3d 438, 116 Cal. Rptr. 133 (1974), represents bad precedent as well as an unreasonable intrusion into legitimate prosecutorial prerogatives. I am no more disposed today than I was in Franklin, "to establish yet another technicality in criminal procedure hitherto unknown to Nevada Criminal jurisprudence...." Franklin v. State, 94 Nev. at 228, 577 P.2d at 865 (Manoukian, J., dissenting). Indeed, not only is Medina a product of California district appeals court, but there were no other reported judicial opinions in the United States or Canada, that went to the liberal extreme of Medina, fact for fact. (cite omitted).
As the above-cited concurring opinion noted, Medina and its offspring, including Franklin and Burns are in the definite minority *1285 in deciding that a due process violation has occurred where the State withholds its performance in a plea bargain until after an accomplice has testified. In State v. DeWitt, 286 N.W.2d 379, 384 (Iowa 1979), the Iowa Supreme Court expressly rejected the Nevada court's approach and in doing so noted the various jurisdictions which have accepted accomplice testimony given before the prosecution fulfills promises made to the accomplice through a plea agreement:
A promise of immunity, lenient treatment, prosecutorial abstinence, or favor ordinarily is viewed merely as removing a possible barrier to a willing response to the testimonial call of a witness. The promise goes only to the credibility of the promisee, not to the admissibility or competency of the testimony. State v. Houston, 206 N.W.2d 687, 690 (Iowa 1973); see Giglio v. United States, 405 U.S. 150, 155, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 109 (1972); McDonald v. State, 249 Ark. 506, 507, 459 S.W.2d 806, 807 (1970); Evans v. State, 222 Ga. 392, 403, 150 S.E.2d 240, 248, cert. denied, 385 U.S. 953, 87 S.Ct. 336, 17 L.Ed.2d 231 (1966); People v. West, 54 Ill. App.3d 903, 906, 370 N.E.2d 265, 269, 12 Ill.Dec. 642, 646 (1977); Coleman v. State, 264 Ind. 64, 67, 339 N.E.2d 51, 54 (1975); State v. McGlynn, 292 Minn. 405, 409, 195 N.W.2d 583, 585 (1972); State v. Woods, 346 Mo. 538, 546, 142 S.W.2d 87, 90 (1940); State v. Crepeault, 126 Vt. 338, 340, 229 A.2d 245, 246 (1967); cert. denied, 389 U.S. 915, 88 S.Ct. 249, 19 L.Ed.2d 267, appeal dismissed, 390 U.S. 38, 88 S.Ct. 833, 19 L.Ed.2d 813 (1968); (other cites omitted).
Id.
The jury was first informed of Vincent Harris' plea bargain by the State during voir dire proceedings. Thereafter, Vincent Harris testified to his agreement to testify for the State in exchange for which he would be allowed to plead guilty as an accessory after the fact with no recommendation of sentence by the State. We decline to find any violation of Foster's due process rights under these circumstances. There is no indication that Harris' plea reduction was made conditional upon "false or specific testimony or a specific result," such as to render it inadmissable. State v. DeWitt, 286 N.W.2d at 384, citing People v. Medina, 41 Cal. App.3d at 455-56, 116 Cal. Rptr. at 141-43. To the contrary, Harris himself testified the agreement was for him to "tell the truth." Further, counsel for Foster cross-examined Harris extensively on the plea bargain.
We decide to align ourselves with those jurisdictions which have declined to find that the practice of the prosecution's withholding its end of a plea bargain until a codefendant has testified results in tainted and inadmissible testimony. Rather, we would agree with the assessment of the court in People v. Green, 102 Cal. App.2d 831, 838, 228 P.2d 867, 871 (1951), that such promises by the prosecution are "conditional in nature," and we might add, permissibly so:
It is a practice which seems to be approved in all jurisdictions, if the ends of justice will be thereby served, to extend immunity to one jointly charged with crime, upon condition that he testify fully and fairly as to his knowledge of the facts out of which the charge arose. (emphasis in original).
Id.
We place our trust in the trier of fact to determine the effect of such an agreement upon the credibility of a particular codefendant turned State's witness, and hold that the existence of the witness' plea bargain is a consideration in the credibility, not the admissibility of the witness' testimony.

XVII.

THE REMARKS OF THE JUDGE TO THE VENIRE THAT THIS WAS A NOTORIOUS CASE WAS IMPROPER AND RESULTED IN AN UNFAIR TRIAL FOR DEFENDANT IN VIOLATION OF MISSISSIPPI LAW AND THE UNITED STATES CONSTITUTION.
In opening remarks to the venire, the trial judge remarked as follows:
The Supreme Court of the State of Mississippi requires that certain cases by moved from the county or area in which a crime may have occurred to another county for trial. That may be because of publicity *1286 or community attitudes or whatever, but there are certain cases that must by law be moved and heard in another county. This is one of those cases where due to the nature of the case and the publicity involved that it would be difficult if not impossible to obtain a jury that could sit and put aside any publicity or preconceived notions or ideas that they may have about the case, and this particular case is one of those cases. This is a case wherein there is a possibility of the infliction of the death penalty, and state law requires that case be moved to another county for trial.
Foster raised no objection to the introductory statements of the trial judge to the venire. The rule that any error is waived if no contemporaneous objection is made is equally applicable in capital cases. Cole v. State, 525 So.2d 365 (Miss. 1987).
However, were we to address this assignment, we would find it to be without merit. We do not agree with Foster's conclusion that, through the trial judge's statements, the jury was informed that the case was "notorious," and the county where the crime occurred was accordingly in such a state of "disarray and upheaval" that an impartial jury could not be obtained. We find the judge's remarks explaining to the jury why they were deciding a case which occurred in another county to be brief and neutral. Beyersdoffer v. State, 520 So.2d 1364, 1366 (Miss. 1988).
This assignment is rejected as being both procedurally barred and without merit.

XVIII.

THE TESTIMONY OF THE STATE'S PATHOLOGY WITNESS WAS IMPROPER AND RESULTED IN AN UNFAIR TRIAL FOR DEFENDANT IN VIOLATION OF MISSISSIPPI LAW AND THE UNITED STATES CONSTITUTION.
We next consider Foster's argument that the trial court committed reversible error in allowing the State's expert witness to testify to his opinion of the distance from which the fatal gunshot was fired. Dr. Ricky Hicks was certified as an expert witness for the State in the field of pathology. During direct examination, the State asked Dr. Hicks if he had an opinion regarding the distance from which the shot that killed the victim was fired. Foster objected on the ground that "Doctor Hicks has been made an expert in the pathology not ballistics  ." The trial court overruled the objection and Dr. Hicks testified as follows:
Well I  I can't, uh,  it's an intermediate distance, but, uh, from my training and research from what I know and have read about, uh, it should have been  it was greater than two feet. The  the shot was fired greater than two feet away from the wound.
This Court in May v. State, 524 So.2d 957 (1988), set forth the standard to be used in determining whether a witness is qualified to testify as an expert. In that case, the appellant complained that a forensic pathologist should not have been allowed to state his opinion that the fatal wound was not a close contact wound because he lacked ballistics training. The lower court reviewed the witnesses' credentials and found he was qualified to testify concerning the proximity of the firearm to the wound. This Court agreed, stating:
Generally, ... the decision of whether or not an expert witness is qualified to testify is within the trial court's discretion. See Detroit Marine Engineering v. McRee, 510 So.2d 462, 467 (Miss. 1987); Hooten v. State, 492 So.2d 948 (Miss. 1986). The test is whether a witness "possesses peculiar knowledge or information regarding the relevant subject matter which is not likely to be possessed by a layman." McRee, 510 So.2d at 467; Henry v. State, 484 So.2d 1012, 1015 (Miss. 1986).
Id. May v. State at 963.
Foster asserts that because Dr. Hicks stated on cross-examination that he had no "formal training in firearms or ballistics," that he was testifying outside his area of expertise when he stated his opinion that the fatal shot was fired from more than two feet away from the wound.
The record indicates that prior to performing an autopsy on George Shelton, Dr. Hicks *1287 had two years of experience in the field of pathology following his residency. Although he stated he had no formal training in forensic pathology, he had studied the subject in general during his residency and in preparation for the board examination in pathology. Further, the doctor had attended three or four conferences on forensic pathology and had personally completed approximately 8 to 10 autopsies involving gunshot wounds. Prior to stating his opinion on the distance from which the shot was fired in the case sub judice, Dr. Hicks testified that his autopsy revealed a lack of an abrasion ring, black soot or stippling around the wound, all of which are indicative of a shot fired from close range.
On cross-examination, Dr. Hicks explained his opinion was a generalization based on his training and experience with gunshot wounds. Based on his studies, he disagreed that the gun could have been only twelve inches away from the victim when fired. On redirect, Dr. Hicks further testified, based on his training and experience, that the absolute minimum distance from which a shot could have been fired without leaving any abrasions or stippling would be eighteen to twenty-four inches.
Applying the test set forth in May, we find the trial court committed no error in allowing Dr. Hicks to give his opinion on the distance from which the fatal shot was fired. The doctor's testimony relating the absence of evidence consistent with a close contact wound and his opinion, based on experience and study, of this particular wound, was not simple conjecture, but was certainly "sufficiently outside the common experience to be the subject of a `helpful' expert opinion." May v. State, 524 So.2d at 964.
This assignment is rejected as being without merit.

XIX.

THE STATE'S REFERENCE TO DEFENDANT'S ATTEMPT TO KEEP OUT EVIDENCE WAS NOT PROPER AND RESULTED IN AN UNFAIR TRIAL FOR DEFENDANT IN VIOLATION OF MISSISSIPPI LAW AND THE UNITED STATES CONSTITUTION.
Foster contends that in closing arguments on two occasions the State improperly commented on his exercise of constitutional protections, requiring a reversal of his conviction and sentence. The first alleged instance, to which Foster failed to offer any objection at trial, came as a result of the following argument by the prosecutor:
I have not withheld from you in this case nor have I ever withheld in any case any evidence. I attempted to introduce for you all of the statements of Vincent Harris, every one of them. They were the ones that objected to it, not me. I wish you did have them to look at them, read them all, but you don't. What you have is his testimony, and what you have is testimony corroborated in every particular from start to finish; testimony, ladies and gentlemen, that is in large measure admitted to by the defendant himself in almost every particular from start to finish.
Foster cites Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) as support. We find this case to be wholly inapplicable to the facts of the instant case and thus of no assistance to Foster. Griffin dealt with a prosecutor's comments to the jury on the exercise by the accused of his right not to testify. Foster further cites Hosford v. State, 525 So.2d 789 (Miss. 1988), wherein this Court stated that in a criminal case, the prosecutor "must be fair and impartial and see that the defendant is not deprived of any constitutional or statutory right." Id. at 792. We find that Hosford is equally inapplicable to the case at bar. That case dealt with a prosecutor's cross-examination of a witness with regard to prior convictions where the State had no factual basis for believing that the witness had any prior convictions.
As noted above, Foster declined to object to part of the closing argument which he now asserts constitutes reversible error. That point is improperly raised before this Court for the first time and is procedurally barred. Johnson v. State, 404 So.2d 553 (Miss. 1981). As for the second complained of instance, Foster at trial objected to the following *1288 statements of the prosecutor as "improper argument":
Ladies and gentlemen, the whole truth of the matter is, is that George Shelton is dead, and he is not coming back, and this is not a game, and though lawyers may play their games and lawyers may try and conceal facts from you and conceal the truth from you, the ultimate truth is still before you. Don't lose sight of it.
It is not at all clear how the prosecutor's argument constitutes a disparaging remark against the accused for exercising his constitutional rights, as Foster contends on appeal. After overruling Foster's objection, the trial court did state that he had "instructed the jury on numerous occasions that what the attorneys say is not evidence and not to be considered by them as evidence." We find this cautionary instruction was sufficient to cure any error alleged, though we find none. This point is without merit.
This assignment is rejected as being procedurally barred in part and completely without merit.

XX.

THE STATE'S REMARK DURING CLOSING THAT HARRIS'S TESTIMONY WAS "CORROBORATED IN EVERY PARTICULAR" WAS AN IMPROPER BOLSTERING OF THE TESTIMONY IN VIOLATION OF MISSISSIPPI LAW AND THE U.S. CONSTITUTION
Foster takes issue with the portion of the State's closing argument raised as error in the previous assignment, claiming that the statement to the jury that Harris had been "corroborated in every particular" amounted to improper bolstering. Foster also asserts the following statement from the prosecutor also amounted to error:
He [Harris] took the witness stand; he testified truthfully; he will get that reduced charge now no matter what. I'm bound by that. I am committed. So, yes, I believed him. I believed him enough to do that, and I still believe him.
Foster made no contemporaneous objection to either argument, but argues that the plain error doctrine absolves him of this responsibility, citing United States v. DiLoreto, 888 F.2d 996, 999 (3rd Cir.1989) and United States v. Garza, 608 F.2d 659, 665-66 (5th Cir.1979). However, DiLoreto is not a plain error case as the defendant unsuccessfully moved for mistrial following the improper commentary. 888 F.2d at 1000. In Garza, though, the Fifth Circuit held that the prosecutor's expression of a personal opinion that he believed the witnesses for the U.S. over defense witnesses "sought to use the status and influence of the entire governmental investigatory apparatus to bolster the believability of his case. It is impossible to imagine this strategy did not have substantial influence on the jury." 608 F.2d at 666. According to the Garza court, while the defendant did not object to a series of comments made by the prosecutor bolstering U.S. witnesses and as the trial judge should have intervened sua sponte, the prosecutor's conduct constituted plain error[1] and prejudiced the defendant's fundamental right to a fair trial. Id.
A prosecutor is forbidden from interjecting his personal beliefs regarding the veracity of witnesses during closing argument. United States v. Young, 470 U.S. 1, 5, 20, 105 S.Ct. 1038, 1041, 1048-49, 84 L.Ed.2d 1, 6, 15 (1985); Dunaway v. State, 551 So.2d 162, 164 (Miss. 1989) (prosecutor who referred to defense expert as "a whore" committed error, but not reversible error); Tubb v. State, 217 Miss. 741, 743-45, 64 So.2d 911, 912-13 (1953) (prosecutor who tells jury during closing argument he knew the State's witnesses were telling the truth commits error which may be reversible). By the same token, it is incumbent on defense counsel to raise a proper objection when the offensive *1289 language is uttered or waive appellate review of the issue. Marks v. State, 532 So.2d 976, 984 (Miss. 1988); Johnson v. State, 477 So.2d 196, 209-10 (Miss. 1985), cert. denied 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986). This rule provides the trial court with the opportunity to sustain an objection and admonish the jury to disregard moments after the erroneous language is uttered. Monk v. State, 532 So.2d 592, 600-01 (Miss. 1988); Baker v. State, 327 So.2d 288, 292-93 (Miss. 1976). The defendant who fails to make a contemporaneous objection must rely on plain error to raise the assignment on appeal. Gray v. State, 487 So.2d 1304, 1312 (Miss. 1986). Furthermore, although the State fails to mention it in its brief, Foster did not bother to offer the prosecutor's erroneous comments during closing as a ground for a new trial in his post-trial motion. This Court has held that error not raised at trial or in post-trial motions (as would apply to the first two instances provided in this assignment) may not be reviewed on appeal. Watts v. State, 492 So.2d 1281, 1291 (Miss. 1986) (regarding waiver for failure to include in post-trial motions); Sumner v. State, 316 So.2d 926, 927 (Miss. 1975) (regarding waiver for failure to contemporaneously object). Any claim of error is now waived and therefore barred from consideration on this appeal for failure to object.
Even if not barred, the first comment complained of was invited by Foster when he argued that the State did not believe Vincent Harris, the codefendant who testified against Foster. Foster's counsel stated:
So Vincent Harris makes a deal with the State. Now they believe him. Now remember this, the State believes Vincent Harris, so they immediately drop those charges of capital murder against him, don't they? No, the don't [sic]. He's still up here on that stand[,] is still charged and still stands today charged with capital murder. So does the State believe him? No, the State doesn't believe him either, but they want you to. For shame! That is for shame, ....
So they give Vincent Harris a [sic] accessory after the fact. Well when did they decide to do that? Have they done it yet? Naw. He sat there on that stand charged with capital murder just like Chris Foster, but the State wants you to believe him, and they don't believe him, and they want you to believe him. Ladies and gentlemen, something is bad, bad, bad, bad, bad wrong.
When viewing the closing argument in its entirety, the brief reference to the statement can hardly be said to be error. This Court does not find that alleged "bolstering" statements made by the prosecutor rise to the same level of plain error that, for example, exist within a statement concerning the defendant's failure to testify. See Livingston v. State, 525 So.2d 1300, 1306-08 (Miss. 1988). We do not find this issue to have merit.
As a final note, Foster contends the portion of the prosecutor's closing argument discussed in this assignment violated the Mississippi Rules of Professional Conduct 3.4(e):
A lawyer shall not:
* * * * * *
(e) in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a witness, the culpability of a civil litigant or the guilt or innocence of an accused.
Foster merely states Rule 3.4(e) in support of his argument that the prosecutor's statements to the jury constituted reversible error. He seeks no remedy for the alleged violation. We find no merit to this assignment of error by Foster.

XXI.

THE DISTRICT ATTORNEY'S COMMENTS ON RONALD CHRIS FOSTER NOT TESTIFYING VIOLATED THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ART. 3, SEC. 25 OF THE MISSISSIPPI CONSTITUTION.
Foster here contends that various statements by the prosecutor during closing *1290 arguments in the guilt phase of the trial impermissibly focused the attention of the jury on his decision not to testify. The portions of the State's closing argument to which Foster objects were stated as follows:
There is no question as to who the identity of the individual was in the store that night. You know that, ladies and gentlemen, because he has admitted to it. You heard him on the tape in his own voice that he was the man in the store that night when George Shelton was killed.
Vincent Harris told you that that particular night Ronald Chris Foster was wearing a yellow hat. He said it was, `my brother's hat.' It wasn't really Ronald Chris Foster's hat, he'd just loaned it to him, and, ladies and gentlemen you know that's true  you know that's true, ladies and gentlemen because Ronald Chris Foster admits to that. Listen to the tape; look at the transcript that you've been tendered in evidence; he says on that tape, `Yes, it was Danny Macon's hat. He loaned it to me to wear, but I did have it on that night.' He also told you that he went to that store and in the course of going to that store, and he rode up to the store on his bicycle  on Vincent Harris's bicycle, and once again, ladies and gentlemen, you know that's true also; that's corroborated once again from the mouth of Ronald Chris Foster.
Ladies and gentlemen, the whole truth of the matter is, is that George Shelton is dead, and he is not coming back, and this is not a game, and though lawyers may play their games and lawyers may try and conceal the facts from you and conceal the truth from you, the ultimate truth is still before you. Don't lose sight of it.
It may be recalled from our discussion in Assignment XIX that Foster objected to the latter statement at trial and was overruled. As for the remaining two portions of the State's closing argument which Foster now contends require a reversal, we find the issue is procedurally barred from our consideration as there was no contemporaneous objection offered at trial. Cole v. State, 525 So.2d 365 (Miss. 1987).
However, were we to consider this issue we would find it to be without merit. It is evident even from the limited portions of the district attorney's argument which Foster strings together that the State in no way, directly or indirectly, commented on or alluded to Foster's failure to take the stand. To the contrary, the State attempted to turn the jury's attention to Foster's statement to the police and his confession contained therein. This is a matter entirely within the wide range of material which may be referenced in closing arguments. In Johnson v. State, 416 So.2d 383 (Miss. 1982), this Court stated:
`Counsel necessarily has and must have to serve his function and office, a wide field of discretion. He may comment upon any facts introduced into evidence.

.....
He may give wing to his wit and play to his imagination so long as he does not imagine fact not in evidence, which the court does not take judicial knowledge of, or does not go out of the record for the facts not in evidence.'
Id. at 391.
This Court has made it clear that the State may not comment on a defendant's decision not to testify. Griffin v. State, 557 So.2d 542 (Miss. 1990); Jimpson v. State, 532 So.2d 985 (Miss. 1988). This the prosecutor in the instant case did not do. Neither did the prosecutor during his final argument to the jury utilize facts not in evidence. Reference to Foster's statement to the police, introduced into evidence, was certainly permissible. As this Court has stated previously, "there is nothing to authorize the court to interfere until there is either abuse, unjustified denunciation, or a statement of fact not shown in evidence." Gray v. State, 351 So.2d 1342, 1346 (Miss. 1977).
Accordingly, the majority of this assignment is rejected as being procedurally barred, and in addition, the entire assignment is further rejected as being without merit.

XXII.

THE JUDGE'S ASSISTANCE TO THE DISTRICT ATTORNEY ON SEVERAL OCCASIONS WAS IMPROPER AND *1291 RESULTED IN AN UNFAIR TRIAL FOR DEFENDANT IN VIOLATION OF MISSISSIPPI LAW AND THE UNITED STATES CONSTITUTION.
Foster argues the trial judge on three occasions wrongfully assisted the prosecutor and that the judge's assistance constituted reversible error. Though Foster now complains of these alleged errors, he failed to do so at the relevant time during the proceedings and is thus procedurally barred from doing so before this Court. Cole v. State, 525 So.2d 365 (Miss. 1987).
Foster complains of the following exchanges between the trial judge and the prosecutor:
BY THE STATE: If your Honor please, I'm not sure how the Court wants me to rephrase it. I'm asking for the tendencies he has observed over his years as an investigator in this 
BY THE COURT: Ask him what happened in this particular case.
* * * * * *
BY THE DEFENSE: We have nothing further on this motion [to suppress], your Honor.
BY THE COURT: Are you going to have redirect  rebuttal I mean?
BY THE STATE: I think I have to, don't I, Judge?
BY THE COURT: I think under Agee you do, but I'm going to take a brief recess before you do.
* * * * * *
BY THE STATE: If your Honor please, they've made an objection and I did not understand the basis for their objection. Might I inquire as to what the basis for their objection is?
BY THE COURT: The  the question is incomplete to ask that hypothetical. Make your question complete.
BY THE STATE: I understand your Honor.
Foster cites only West v. State, 519 So.2d 418 (Miss. 1988) in support of his contention that the statements by the trial judge served to impermissibly assist the State. That case is easily distinguished from the case sub judice. In West, the Court found the trial judge "improperly, or unnecessarily, interjected himself into the proceedings" a total of thirty times. Id. at 421. The Court continued:
Of those thirty instances, twenty are of the type which may be characterized as coaching the district attorney. On nine occasions, the trial judge posed questions to witnesses where the district attorney's questions were ineffective. The questions by the trial judge generally served to strengthen the prosecution's case.
Id. at 421.
We find that the statements by the trial judge of which Foster complains simply do not rise to the level of impermissible interference found to exist in West. Any supposed error by the trial judge was harmless indeed. Furthermore, though Foster contends that the judge's statements posed a danger of his exerting an "undue influence on the jury," we find this risk to be nonexistent considering that not one of the exchanges occurred within the jury's hearing.
This assignment is both procedurally barred and without merit.

XXIII.

THE INDICTMENT CHARGED DEFENDANT WITH ARMED ROBBERY BUT THE INSTRUCTION TO THE JURY SET OUT A CHARGE OF ROBBERY WHICH VIOLATED DEFENDANT'S RIGHTS UNDER MISSISSIPPI LAW AND THE UNITED STATES CONSTITUTION.
Foster contends his conviction and sentence must be reversed because although the indictment against him charged murder during the commission of an armed robbery, the relevant jury instruction was labelled only as one on robbery. Therefore, Foster argues, the appellant was not given notice of the theory under which the State was proceeding against him, the jury was not instructed on the elements of armed robbery and the jury made no finding of armed robbery.
Foster's indictment read as follows:

*1292 That Ron Chris Foster late of [Lowndes] County, on or about the 10th day of June, 1989, did unlawfully, wilfully, and feloniously, with or without the design to effect death, kill and murder George Shelton, a human being, without authority of law and not in necessary self defense, while engaged in the commission of the crime of Armed Robbery, in violation of Section 97-3-19(2)(e) MCA 1972 as amended contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the State of Mississippi.
Although the jury instruction on the underlying felony, SGP-3, was termed one on "robbery," the elements contained therein were clearly those comprising the crime of armed robbery. Instruction SGP-3 read:
The Court instructs the Jury that robbery, as used in these instructions, is defined as unlawfully, wilfully and feloniously taking or attempting to take away from the presence of another person, some item of personal property, against his will by violence to his person, or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon. (emphasis added).
Despite the omission of the word "armed" from the instruction, there is no doubt that the jury was adequately instructed on the elements of that offense. Further, the jury was required to and did find Foster guilty beyond a reasonable doubt of all the elements contained in the indictment.
Foster cites no authority for his proposition that reversible error exists where the proper elements of the crime charged are presented to the jury, although the labelling of the crime as it appears in the indictment and the instructions is not identical in all respects. We find no such authority and thus find this point to be lacking in merit.
Finally, along the same line of argument, Foster submits to this Court that he was given no notice of the nature of the charges against him. A reading of the plain language of the indictment indicates this is simply not true. Rule 2.05 of the Mississippi Uniform Criminal Rules of Circuit Court Practice provides:
The indictment upon which the defendant is to be tried shall be a plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation against him.
The indictment set forth the elements of the underlying crime of armed robbery. No more adequate notice could have been provided Foster, particularly since the language of the indictment is consistent with that found in Miss. Code Ann. Section 97-3-79, defining the crime of armed robbery.
This assignment is wholly without merit.
There being no error found in the guilt phase of the trial, Foster's conviction of capital murder will be affirmed.

SENTENCING PHASE

I.

THE DEATH PENALTY FOR JUVENILES WITHOUT ANY PRIOR CRIMINAL RECORD OR WITHOUT ANY PARTICULARIZED FINDINGS BEING MADE BEFORE BEING TRANSFERRED TO STAND TRIAL AS AN ADULT VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE THREE, SECTION 28 OF THE MISSISSIPPI CONSTITUTION.

II.

SECTIONS 43-21-151(1) AND XX-XX-XXX ARE UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS IN THAT THEY DO NOT SET A MINIMUM AGE BELOW WHICH A CHILD MAY NOT BE TRANSFERRED FROM YOUTH COURT TO CIRCUIT COURT FOR CRIMES PUNISHABLE BY LIFE IMPRISONMENT OR DEATH.
Issues I and II are similar and will be considered together by the Court.
*1293 Foster was seventeen years of age at the time he is alleged to have robbed Hankins Superette in Columbus and killed the store clerk, George Shelton. Generally, the youth court has exclusive jurisdiction over criminal cases brought against defendants under the age of eighteen. See Miss. Code Ann. §§ 43-21-105(d) (Supp. 1992) and 43-21-151(1) (Supp. 1992). Where the youth court has such exclusive jurisdiction, juveniles may not be tried as adults unless the youth court, in its own discretion, decides to "transfer jurisdiction of the alleged offense ... or a lesser included offense to the criminal court which would have trial jurisdiction of such offense if committed by an adult." Miss. Code Ann. § 43-21-157 (Supp. 1992). Before it may transfer a juvenile for trial in the circuit courts, however, the youth court must first conduct a bifurcated hearing and: 1) "determine... [that] probable cause exists to believe that the child committed the alleged offense"; and 2) find "by clear and convincing evidence that there are no reasonable prospects of rehabilitation within the juvenile system". Miss. Code Ann. § 43-21-157(3) and (4) (Supp. 1992).
Under Mississippi law, these juvenile certification procedures do not take place if a child commits an act, "which if committed by an adult would be punishable under state or federal law by life imprisonment or death," Miss. Code Ann. 43-21-151(1) (Supp. 1992), because original jurisdiction is vested in the circuit courts under such circumstances. Also, Mississippi law places no expressed minimum age limit on the imposition of the death penalty. See Miss. Code Ann. § 99-19-101 (1972). Thus, in the instant case, §§ 43-21-151(1) and 99-19-101 of the Code combined to allow Foster, 17 years old at the time of his offense, to be tried and convicted of a capital offense and receive the death sentence, without there ever having been a preliminary determination in the youth court that he should be tried as an adult.
Technically, in Mississippi, anyone under thirteen years of age could never receive the death penalty, as § 43-21-151(3) prohibits charging either a misdemeanor or felony offenses for children under thirteen. Likewise, anyone thirteen years of age and above is eligible for the consideration for the death penalty if they commit capital murder. However, consistent with the United States Supreme Court's ruling in Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), no one under the age of sixteen years of age could receive a sentence of death, as that would be a violation of the Eighth Amendment to the U.S. Constitution.
Foster argues that Mississippi procedure violates the Eighth Amendment prohibition against cruel and unusual punishment under the precedent of Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), Wilkins v. Missouri, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), and Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988). He also contends the analogous prohibition contained in Article 3, § 28 of the Mississippi Constitution has been violated. The State responds first with the contention that Foster's claim is procedurally barred from consideration on appeal. Alleging several grounds for this contention the State avers: 1) Foster stated before the lower court that the Eleventh Amendment to the United States was the basis for his contention that imposition of the death penalty on Appellant violated the constitutional prohibition against cruel and unusual punishment; 2) Foster failed to obtain a trial court ruling on his Motion to Exclude the Death Penalty, which contained his claimed cruel and unusual punishment violation; and 3) Foster's Motion to Exclude the Death Penalty did not claim as its basis Mississippi's procedure of vesting original jurisdiction of juvenile capital cases in the circuit courts.
Foster's Motion to Exclude the Death Penalty contained the following statements regarding a violation of the cruel and unusual punishment prohibition:
Comes now the Defendant, RON CHRIS FOSTER, by and through his counsel and files this his Motion to exclude the death penalty as the permissible punishment in the above styled and numbered cause and in support thereof would respectfully show unto the court as follows, to wit;

*1294 I.
The Defendant at the time of the alleged commission of the crime charged above was seventeen years of age and a minor under the laws of the State of Mississippi.
II.
The Defendant would move the court to exclude the death penalty as a permissible punishment in this cause, should the defendant be convicted, as the death penalty constitutes cruel and unusual punishment in violation of the United States Constitution, 11th Amendment, the Mississippi Constitution and Federal and State statutes and laws.
III.
The Defendant would show that the death penalty should be excluded as punishment as it is unconstitutional as applied to the defendant, who was a minor at the time of the commission of said crime and such would deny the defendant of his fundamental constitutional rights under the 11th Amendment of the United States Constitution, the Mississippi Constitution, and applicable Federal and State statutes and laws.
Foster's reference to the Eleventh Amendment appears to be inadvertent, as the claim set forth is clearly based on the federal constitution's cruel and unusual punishment prohibition. That prohibition only appears in the Eighth Amendment. Furthermore, the elaboration of the claim is certainly sufficient to convey notice of its true nature to the State, and the State's appellate brief in this matter reflects that they understood appellant's cruel and unusual punishment challenge to be based on the Eighth Amendment. In addition, when defense counsel stated during pretrial proceedings that the motion was based on the Eleventh Amendment, the prosecutor corrected defense counsel and said he believed the appropriate amendment was the Eighth Amendment.
The record also belies the State's second contention that Foster failed to get a trial court ruling on his Motion to Exclude the Death Penalty. Defense counsel first attempted to introduce the motion during pretrial proceedings, and the following discussion occurred:
BY MR. FARROW (Defense Counsel): Your honor, we had filed one other motion to exclude the death penalty and to find the death penalty unconstitutional, and we'd ask for a ruling on that later at the end of State  case  State's case in chief.
* * * * * *
BY THE COURT: We may not even have to face that. You're assuming  assuming guilt through the guilt phase to get to that motion and I feel that there would be sufficient time to take that up should a verdict of guilty in the guilt phase be rendered.
The motion was brought up again during the preliminary stage of the sentencing phase, and the following in-court discussion took place:
BY MR. FARROW: Your honor, also we'd like to bring a motion to the attention of the court that we had previously filed on the exclusion of the death penalty which you said would  I should not 
BY THE COURT: Refresh my memory. That's the one that I said at the appropriate time 
BY MR. FARROW: That's correct.
BY THE COURT:  It might not even go to the sentencing phase, and you want  that  that motion has been overruled I think or will be at this time because we've already proceeded to that.
BY MR. FARROW: Well are you saying it wasn't  it's  I haven't brought it up timely.
BY THE COURT: No, what I'm saying is 
BY MR. FARROW:  Or are you saying you over 
BY THE COURT:  Is that we've already gone into that anyway  into the sentencing phase by inference that motion has been overruled, but for the record I will show that I  that motion is overruled.
There was thus a clear ruling made on the record on Foster's Motion to Exclude the Death Penalty.
*1295 The State's final contention in support of its claim of procedural bar  that Foster did not raise in the trial court Mississippi's procedure for handling juvenile capital cases as the basis of his cruel and unusual punishment claim  appears meritorious. There was no argument at trial on Foster's motion; and as can be seen from the portion of Foster's motion reprinted above, the text of the motion itself presents a substantive challenge to the constitutionality of sentencing seventeen-year-old offenders to death. It has generally been held by this Court that issues must be raised at the trial level before they become ripe for consideration at the appellate level. Parker v. Mississippi Game and Fish Commission, 555 So.2d 725 (Miss. 1989); Educational Placement Services v. Wilson, 487 So.2d 1316 (Miss. 1986); Mills v. Nichols, 467 So.2d 924 (Miss. 1985); Natural Father v. United Methodist Children's Home, 418 So.2d 807 (Miss. 1982). This Court has noted on numerous occasions, however, that an exception to this general rule exists for issues affecting fundamental rights. Willie v. State, 585 So.2d 660 (Miss. 1991); Gallion v. State, 469 So.2d 1247 (Miss. 1985); Billiot v. State, 454 So.2d 445 (Miss.), cert. denied, 469 U.S. 1230, 105 S.Ct. 1232, 84 L.Ed.2d 369, rehearing denied, 470 U.S. 1089, 105 S.Ct. 1858, 85 L.Ed.2d 154 (1984); House v. State, 445 So.2d 815 (Miss. 1984). Moreover, the Court has also proclaimed, "[w]e have in death penalty cases the prerogative of relaxing our contemporaneous objection and plain error rules when the interests of justice so require." Williams v. State, 445 So.2d 798 (Miss. 1984), citing Culberson v. State, 379 So.2d 499, 506 (Miss. 1980) and Bell v. State, 360 So.2d 1206, 1215, 1217-1218 (Miss. 1978). Some issues are of such importance and of first impression that in spite of a statutory bar, this Court should proceed and address that particular issue. Our precedents do not preclude our basing a decision on both procedural and substantive grounds. This Court in Ex Parte Shed Castle, 248 Miss. 159, 159 So.2d 81 (1963), stated: "A decision on appeal should be limited to a consideration of and ruling upon those issues necessary to a proper disposition of the appeal." Id. at 164, 159 So.2d 81. This Court clearly has the discretion to consider appellant's cruel and unusual punishment challenge concerning our statutes failure to state a minimum age that a person could be subject to the death penalty and the failure of our statutes to require a certification proceeding in youth court for persons under age 18 charged with a capital offense. We will address that claim of error, although it is clearly without merit.
The Eighth Amendment to the United States Constitution mandates that "cruel and unusual punishments" shall not be inflicted. U.S. CONST. amend. VIII. The Eighth Amendment prohibitions have been made applicable to the States through the Fourteenth Amendment to the United States Constitution. Article 3, § 28 of the Mississippi Constitution forbids the infliction of "cruel or unusual punishment."[2] The United States Supreme Court has already decided through the cases of Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), and Wilkins v. Missouri, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) that sentencing a fifteen year-old offender to death is per se cruel and unusual punishment, Thompson, and imposing the death penalty on a sixteen or seventeen year-old offender does not constitute such a per se violation. Stanford and Wilkins.
Foster argues that the provisions of Miss. Code Ann. § 43-21-151(1) (Supp. 1991), violate the Eighth and Fourteenth Amendments to the United States Constitution and Article Three, Section 28 of the Mississippi Constitution. He claims that the provision for original jurisdiction in the circuit court constitutes cruel and inhuman punishment *1296 under the Eighth Amendment. This position is absurd. Which court has jurisdiction over a capital death case dealing with a seventeen year old cannot constitute cruel and inhuman punishment as the issue of which court has jurisdiction fails to constitute any punishment whatsoever.
Foster relies on Stanford v. Kentucky, and Wilkins v. Missouri, attempting to distinguish the Mississippi statutory scheme from that in Stanford and Wilkins, claiming that the youth court had original jurisdiction of both those cases. However, there is no constitutional requirement set forth in either of these cases that a youth court must have original jurisdiction over capital murder cases in order that the death penalty be imposed on sixteen and seventeen year olds.
A review of Justice O'Connor's concurrence in Thompson, clearly reveals that Mississippi's scheme under its statute and constitution passes constitutional muster. Justice O'Connor opines:
Last Term, in Thompson v. Oklahoma, 487 U.S. 815, 857, 101 L.Ed.2d 702, 108 S.Ct. 2687 [2710-11] (1988) (opinion concurring in judgment), I expressed the view that a criminal defendant who would have been tried as a juvenile under state law, but for the granting of a petition waiving juvenile court jurisdiction, may only be executed for a capital offense if the State's capital punishment statute specifies a minimum age at which the commission of a capital crime can lead to an offender's execution and the defendant had reached that minimum age at the time the crime was committed. As a threshold matter, I indicated that such specificity is not necessary to avoid constitutional problems if it is clear that no national consensus forbids the imposition of capital punishment for crimes committed at such an age. Id., at 857, 101 L.Ed.2d 702, 108 S.Ct. 2687 [2710-11]. Applying this two-part standard in Thompson, I concluded that Oklahoma's imposition of a death sentence on an individual who was 15 years old at the time he committed a capital offense should be set aside. Applying the same standard today, I conclude that the death sentence for capital murder imposed by Missouri and Kentucky on petitioners Wilkins and Stanford respectively should not be set aside because it is sufficiently clear that no national consensus forbids the imposition of capital punishment on 16- or 17-year-old capital murderers.

Under these circumstances, unlike the "peculiar circumstances" at work in Thompson, I do not think it is necessary to require a state legislature to specify that the commission of a capital crime can lead to the execution of a 16- or 17-year-old offender. Because it is sufficiently clear that today no national consensus forbids the imposition of capital punishment in these circumstances, "the implicit nature of the [Missouri] Legislature's decision [is] not ... constitutionally problematic."

492 U.S. at 380-81, 109 S.Ct. at 2981, 106 L.Ed.2d at 325-26. [emphasis added.]
This Court considered this issue in Cannaday v. State, 455 So.2d 713 (Miss. 1984), noting that the United States Supreme Court had not addressed the issue of whether the death penalty for a sixteen year old was cruel and unusual punishment.
The United States Supreme Court's silence on this issue of mandatory certification for juveniles under age eighteen, charged with the offense of capital murder, leaves this question of certification open to legislative action.
The capital murder statutes in this state include age as a mitigating factor to be considered by a jury. Miss. Code Ann. § 99-19-101(6)(g) (1972) (1988 Supp.). See also, Tokman v. State, 435 So.2d 664 (Miss. 1983). This Court stated in Cannaday: "In the case sub judice age was considered along with other mitigating circumstances supported by the evidence. With this in mind, the jury returned the sentence of death, 455 So.2d at 725. This Court in Cannaday held that "[e]ven though we grant Cannaday a new trial on the sentence phase, her age at the time of the crime remains a mitigating factor to be considered by the jury. Her age by itself is not grounds for reversal". Id. at 725. See also Jones v. State, 602 So.2d 1170 (Miss. 1992).
*1297 In oral argument the State pointed to a statutory safeguard that was available to Foster prior to jeopardy attaching, had he availed himself thereof. Miss. Code Ann. § 43-21-159(3) (1992 Supp.), provides inter alia,
In any case wherein the defendant is a child as defined in this chapter and of which the circuit court has original jurisdiction, the circuit judge upon a finding that it would be in the best interest of such child and in the interest of justice, may at any stage of the proceedings prior to the attachment of jeopardy transfer such proceedings to the youth court for further proceedings unless the child has previously been the subject of a transfer from the youth court to the circuit court for trial as an adult and was convicted ... and if any child shall be convicted by any circuit court, the trial judge may, in his discretion, commit such child to the county jail for any term not in excess of one (1) year, or he may suspend sentence and release on probation, or commit such child to the custody of the Department of Corrections or impose a fine as though such child was an adult....
The circuit court shall not have the authority to commit such child to the custody of the Department of Youth Services for placement in a state-supported training school....
It becomes obvious from the cited statute that the circuit judge had several options available for consideration in dealing with persons under eighteen years of age, if the proper motion requesting such relief had been filed by Foster.
Mississippi law clearly allows a person under the age of eighteen years, charged with a capital offense, to request by proper motion that the circuit court conduct a special hearing, considering the person's age, lack of prior offenses, likelihood of successful rehabilitation and other factors which favor sending the case to the youth court rather than continuing in circuit court. Had such a procedure been requested, Foster would have had the same individualized consideration in circuit court that would have been available to him in a certification hearing in the youth court. Foster's argument relates to the protections offered by a particular court. He argues that the juvenile justice system is uniquely designed to protect those persons who do not have the maturity and experience to protect themselves, citing Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). The Stanford court stated that "the determinations required by juvenile transfer statutes to certify a juvenile for trial as an adult ensure individualized consideration of the maturity and moral responsibility of 16- and 17-year-old offenders before they are even held to stand trial as adults." 492 U.S. at 375, 109 S.Ct. at 2978. Mississippi's statutory scheme appears to be unique in this area of concern. In spite of the lack of a certification hearing, Foster could have received the same individualized consideration from the circuit court that he now complains he was denied. Foster failed to request this option. Foster failed to present the circuit court with either issue, certification or the conducting of a special hearing for determination to send his case to youth court.
This Court has previously addressed the issues of biological age and mental age in the context of the death penalty. There is no constitutional impediment to the imposition of the death sentence on a seventeen year old under the Mississippi statutes even though the age at which one may receive a death sentence for the crime of capital murder is implied rather than explicitly stated. There can be no doubt that under Mississippi law, no one under thirteen years of age may receive the death penalty because a child under the age of thirteen cannot even be charged with a felony. Foster had available to him the option to make a special request by motion to the circuit judge to send the case to the youth court, but failed to avail himself of this option.
Even if Foster's claims were not barred because of his failure to raise in the trial court (1) the claim that it was unconstitutional not to have a certification procedure in death cases under Mississippi law for persons under 18 years of age and (2) the failure of Mississippi law to set a minimum age for imposition of the death penalty, we would *1298 still find these issues to be totally without merit.
This assignment is procedurally barred and, alternatively, found to be without merit.

VIII.

THE "PECUNIARY GAIN" AGGRAVATOR WAS APPLIED IN A VAGUE AND OVERBROAD MANNER IN VIOLATION OF THE FEDERAL CONSTITUTION AND MISSISSIPPI LAW.
Although the jury was instructed to consider whether the crime was committed for pecuniary gain, Foster argues there was no evidence adduced at trial that the killing occurred for the purpose of pecuniary gain. Further, Foster argues the "pecuniary gain" aggravator was duplicative of the "during the commission of the crime of robbery" instruction in violation of the Eighth Amendment. Finally, Foster contends that the "pecuniary gain" instruction, if examined in isolation, is unconstitutionally vague as "pecuniary gain" does not provide each juror with a "principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." Maynard v. Cartwright, 486 U.S. 356, 363, 108 S.Ct. 1853, 1859, 100 L.Ed.2d 372, 381 (1988) quoting Godfrey v. Georgia, 446 U.S. 420, 433, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398, 406-07 (1980).
Since the "pecuniary gain" aggravator could apply to intentional homicides for hire (i.e., a compensated assassin) just as well as intentional homicides actuated to prohibit police from intercepting an illegal money-making operation (i.e., shooting an officer during a police raid), and as the aggravator could apply to intentional homicides for pecuniary gain (i.e., robbing a store clerk) just as well as unintentional homicides where the perpetrator steals from the victim after completing the unintentional crime (i.e., involuntary manslaughter followed by plundering of the body), Foster contends the "pecuniary gain" instruction must be followed with a limiting instruction. Along this line, Foster points out this Court has criticized the coactive implementation of the "robbery" and "pecuniary gain" instructions. Willie v. State, 585 So.2d 660, 681 (Miss. 1991).
In Willie, this Court established prospective precedent regarding use of the "pecuniary gain" and "robbery," holding the use of both aggravators reversible where the aggravators essentially comprise one course of conduct. "When life is at stake, a jury cannot be allowed the opportunity to doubly weigh the commission of the underlying felony and the motive behind the underlying felony as separate aggravators." Willie, 585 So.2d at 681. Previous cases holding to the contrary were overruled by this Court. Id.
In his reply brief, Foster submits he faces no retroactivity barrier to relief which may have existed in Willie under Jenkins v. State, 607 So.2d 1171, 1182-83 (Miss. 1992).[3] Foster argues that the Jenkins Court, relying on Willie and Ladner v. State, 584 So.2d 743, 763 (Miss. 1991) cert denied, ___ U.S. ___, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991), held William Jenkins was entitled to relief under Willie and Ladner for the stacking of "pecuniary gain" and "robbery" aggravators even though his trial was concluded before Willie and Ladner were handed down. Jenkins, 607 So.2d at 1182-83. Citing Clemons v. State, 593 So.2d 1004, 1006 (Miss. 1992), this Court restated its well-worn principle that it will not reweigh remaining, constitutionally valid aggravators once the jury has been infected with instructions pertaining to one or more constitutionally infirm aggravators. Jenkins v. State, 607 So.2d at 1182-83. Foster's reliance on Jenkins for authority that Willie has been overruled is misplaced. This Court in Jenkins reaffirmed its holding in Willie, pointing to the prospective nature of the decision and reminding the trial courts that it would be reversible error to give the two aggravators separately in future cases subsequent to Willie. The Court in Jenkins, in both the guilt and sentencing phases, emphatically stated those issues which it held were reversible error. The issue of the giving of the two aggravators was not one *1299 where the Court held reversible error. Jenkins was reversed on several grounds in both the guilt and sentencing phases, but any suggestion that Jenkins changed Willie is erroneous.
The State contends that Foster is procedurally barred from raising this assignment as he did not make a proper objection to SSP-4, the State's central instruction containing a listing of the aggravators the jury must find beyond a reasonable doubt. The State asserts "[t]he only specific objection made to the sentencing instruction made by Foster was that it did not list all of the mitigating circumstances that he wished included." Foster claims that he objected to the entirety of SSP-4 as "an incorrect statement of the law", but he failed to say how it was such an incorrect statement of the law other than to claim that the instruction did not contain an exhaustive list of mitigating factors requested by Foster. It is clear that Foster's only specific objection was that the instruction failed to contain all the factors of mitigation the defense asked the jury be allowed to consider. This objection by Foster is too broad to give notice and opportunity for a ruling by the circuit judge on any specific objection other than the one raised by Foster pertaining to the list of mitigating factors. This Court addressed this issue in Edwards v. Thigpen, 433 So.2d 906 (Miss. 1983), wherein Edwards claimed that his interjection of "nonstatutory aggravating circumstances" was raised and preserved at trial. At trial, Edwards' attorney lodged a broad objection that all of the evidence violated Edwards' constitutional rights under the "fifth, sixth, eighth and fourteenth amendment." Id. at 909. This Court in Edwards stated:
We have repeatedly held that the trial court will not be held in error for overruling an objection which is couched in such broad terms as to insufficiently put the trial court on notice as to precisely what error is being alleged. Assuming arguendo that the objection was sufficient to preserve the point for appeal, this ground was not assigned as error or argued on direct appeal and, since the petitioner has accepted the trial court's determination, the issue is barred.
Id.
The State also contends that the determination in Willie that the jury cannot be instructed on "pecuniary gain" and "robbery" aggravators in most circumstances does not apply to Foster as his trial was completed before Willie was handed down. The State is correct in its contention. This Court was clear in Willie, when it stated: "This decision is to be prospective and will take effect from this date forward", 585 So.2d at 681. Willie provided instruction to prosecutors and trial courts that they could not use these two statutory aggravating factors separately in the future.
The claim relating to the giving of the "pecuniary gain" aggravating circumstance is procedurally barred as Foster waived the right to raise this claim on direct appeal by failing to specifically object to the sentencing instruction on this basis. Foster's claim is afforded no relief under Willie, which granted prospective relief only. There is no merit to this issue, in addition to the procedural bar.

IX.

THE TRIAL COURT ERRED IN REFUSING FOSTER'S INSTRUCTIONS AT SENTENCING AS THESE INSTRUCTIONS WOULD HAVE PROPERLY DIRECTED THE JURY.
Foster challenges the court's refusal to grant six of his sentencing instructions: D/S-3; D/S-6; D/S-13; D/S-16; D/S-23; D/S-29. These six instructions are as follows:
Instruction D/S-3
The Court instructs the jury that you need not find any mitigating circumstances in order to return a sentence of life imprisonment.
Instruction D/S-6
The Court instructs the jury that you are not required to find any mitigating circumstance in order to make a recommendation of mercy that is binding on the trial court, but you must find a statutory aggravating *1300 circumstance before recommending a sentence of death.
Instruction D/S-13
Before you may consider imposing death in this case, you must consider whether mercy is appropriate. You, as a juror, have the absolute discretion to exercise mercy and impose a sentence of life imprisonment upon Ron Chris Foster for any reason or for no reason at all.
Instruction D/S-16
You are instructed that you need not find any mitigating circumstances in order to return a sentence of life imprisonment. Moreover, even if you find one or more aggravating circumstances outweigh the mitigating circumstances you can impose a life sentence.
Instruction D/S-23
The Court instructs the jury that there is nothing which would suggest that the decision to afford an individual Defendant mercy and thereby sentence him to life imprisonment violates the laws of this state or your oath as jurors, and even if you find there are no mitigating circumstances in this case which are worthy of your consideration, then, nevertheless, you still may sentence the Defendant to life imprisonment.
Instruction D/S-29
Finally each individual juror must decide for himself whether death or life in prison is the appropriate punishment for Ron Chris Foster. Even if mitigating factors do not outweigh aggravating factors, the law permits the jury to impose a sentence of life imprisonment out of mercy or a determination that life imprisonment is sufficient punishment under the circumstances. Only if you, the jurors, unanimously agree beyond a reasonable doubt that death is the appropriate punishment may you impose the sentence of death. You should indicate your findings on the jury verdict form which you will have with you in the jury deliberation room.
Foster does not address these instructions individually. Rather, he seeks to vindicate all six instructions under the same argument. Similarly, the State treats all six instructions simultaneously, nominating all six "mercy" instructions.
After classifying the six instructions as "mercy" instructions, the State refers to the rule of law in Mississippi that a capital defendant is not entitled to a mercy instruction, but such an instruction may be given at the discretion of the trial court. Wiley v. State, 484 So.2d 339, 349 (Miss. 1986) cert. denied 479 U.S. 906, 107 S.Ct. 304, 93 L.Ed.2d 278 (1986). The State also relies on Jenkins v. State, 607 So.2d 1171, 1181 (Miss. 1992) and Ladner v. State, 584 So.2d 743, 761 (Miss. 1991) for the same principle. Insofar as the State contends Foster is not entitled to a mercy instruction, the State cannot be refuted. In Jenkins, this Court found no reversible error in not giving a mercy instruction. This Court's rationale in Jenkins is found within the Court's statement:
The recent decisions of this Court and of the United States Supreme Court enumerate that a mercy instruction is not required at trial. In Ladner, we held that a defendant "has no right to a mercy instruction." Ladner, 584 So.2d at 761. In Saffle v. Parks, 494 U.S. 484, 492-93, 110 S.Ct. 1257, 1262-63, 108 L.Ed.2d 415, 427-28 (1990), the U.S. Supreme Court stated that the giving of a mercy instruction results in a decision based upon whim and caprice. Thus, the lower court was within its discretion when it denied the mercy instruction below.
607 So.2d at 1181.
Upon close examination we find that the complained of instructions are all mercy instructions. Foster, at most, was entitled to an instruction similar to the one given in Edwards v. Thigpen, 595 F. Supp. 1271 (S.D.Miss. 1984), affirmed sub nom., Edwards v. Scroggy, 849 F.2d 204 (5th Cir.1988), cert. denied sub nom., Edwards v. Black, 489 U.S. 1059, 109 S.Ct. 1328, 103 L.Ed.2d 597 (1989). The district court quoted the instruction given in Edwards, which is almost identical to Instruction SSP-4 given in the case sub judice. In considering whether the instruction gave the jury the option to return a life sentence after it found the existence of aggravating circumstances the district court stated:

*1301 The wording of the first alternative includes the additional phrase "and that the death penalty should be imposed," which gave the jury an option of imposing the death penalty or of granting mercy even if the aggravating circumstances outweighed those which mitigated if they felt the death penalty was inappropriate. Taken as a whole, this Court cannot say that these instructions violated the requirement that instructions be clear on mitigation and the option to recommend against death. Spivey v. Zant, 661 F.2d 464, 470 (5th Cir.1981). This Court finds no basis for requiring the jury to specifically be instructed that they may ignore the balancing of aggravating and mitigating circumstances and vote for life imprisonment based on their decision to be merciful.
595 F. Supp. at 1286.
Miss. Code Ann. § 99-19-101(2)(c) clearly requires that the jury find that the mitigating circumstances outweigh the aggravating circumstances. See Shell v. State, 554 So.2d 887, 904 (Miss. 1989); Jordan v. State, 365 So.2d 1198 (Miss. 1978); Gray v. Lucas, 677 F.2d 1086 (5th Cir.1982).
This Court in Hansen v. State, 592 So.2d 114, 150 (Miss. 1991) held that "our cases have consistently refused to hold that the Court is required to grant a mercy instruction."
Therefore, Foster got all that he was entitled to have in the way of what might conceivably be called a mercy instruction. The lower court was well within its discretion in denying Foster's mercy instructions since this Court has held that a defendant is not entitled to a mercy instruction. This assignment of error is without merit.

X.

THE STATE'S CENTRAL SENTENCING INSTRUCTION AND STATE'S INSTRUCTION ALLOWING SENTENCER TO CONSIDER EVIDENCE PRESENTED DURING THE GUILT PHASE ARE INCORRECT STATEMENTS OF LAW AND VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION.
The appellant next complains about sentencing Instructions SSP-2 and SSP-4, and additionally contends the argument of the State during the sentencing phase went beyond its proper scope. Foster failed to state timely objections to either of these instructions or to the State's arguments at the sentencing. These points are raised for the first time before this Court and are therefore procedurally barred. Moawad v. State, 531 So.2d 632 (Miss. 1988).
Were we to address this assignment, however, we would find it to be without merit. Foster's chief complaint about Instruction SSP-2 is that, in allowing evidence from the guilt phase to be reintroduced, the instruction improperly allowed the jury to consider aggravators other than those allowed under Miss. Code Ann. § 99-19-101(5). Our sentencing procedure requires the jury to determine that any aggravating circumstances it finds are not outweighed by any mitigating factors. "An orderly and coherent procedure in the sentencing phase requires proof of the manner in which the homicide was committed. Facts relevant to an aggravating circumstance are competent." Evans v. State, 422 So.2d 737, 742 (Miss. 1982).
As for Instruction SSP-4, Foster requested an instruction for all intents and purposes identical to one that the State was granted. "It is a familiar rule of law that one may not complain of his own instruction." Hall v. State, 420 So.2d 1381, 1386 (Miss. 1982). Accord Buford v. State, 372 So.2d 254, 256 (Miss. 1979). Accordingly, Foster has no valid complaint about Instruction SSP-4.
In addition to failing to point out any error to the lower court in the arguments by the State during the sentencing phase, Foster has not persuasively shown to this Court that the argument was improper.
This assignment of error is procedurally barred and also completely without merit.

XI.

THE JURY'S SENTENCING DETERMINATION WAS IMPROPERLY PREDICATED ON THE PERSONAL *1302 CHARACTERISTICS OF THE VICTIM IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS AND ARTICLE THREE, SECTION 28 OF THE MISSISSIPPI CONSTITUTION.
Foster contends the jury's sentence was based on "vengeance and sympathy" as a result of the jury's having heard evidence outside the scope of that permitted under Miss. Code Ann. § 99-19-101(5). He cites Willie v. State, 585 So.2d 660 (Miss. 1991) in support. In particular, Foster complains that in the State's closing argument the prosecution noted that Foster's parents were not the only ones who had suffered and grieved, and that the Fosters' tears might be outweighed by the fact of the victim's murder.
Willie is no support for Foster's argument. In that case, this Court noted it would be improper for the State to effectively encourage the jury to weigh the value of the life of the accused against the value of the life of the victim. Id. at 679. In the case at bar, Foster's parents as part of the evidence in mitigation took the stand and tearfully begged the jury not to sentence their son to death. On rebuttal, State's counsel reminded the jury that the victim's parents had also suffered a loss and that in weighing the circumstances, the jury must not forget the "cold calculated killing" of George Shelton. The comments were not improper.
The record indicates Foster failed to offer any objection to the State's closing argument at the sentencing phase. Without a contemporaneous objection, the claim is procedurally barred. Turner v. State, 573 So.2d 657 (Miss. 1990); Willie v. State, 585 So.2d 660 (Miss. 1991).
This assignment is procedurally barred and without merit.

XIII.

THE MITIGATING CIRCUMSTANCE THAT THE DEFENDANT HAS NO SIGNIFICANT HISTORY OF PRIOR CRIMINAL ACTIVITY WAS APPLIED IN AN UNCONSTITUTIONAL MANNER.
Among the list of mitigating factors submitted to the jury for their consideration in sentencing was that the "defendant has no significant history of criminal activity." Foster complains this mitigating factor was unconstitutionally applied in his particular case because it implied that he had at least some criminal history. Actually, Foster had no criminal history at all.
As support Foster cites Cook v. State, 369 So.2d 1251, 1257 (Ala. 1978). In that case, the trial judge as the sentencer found that while the defendant had no "significant" criminal history, he did have "a history" of criminal activity. Id. at 1257. The Alabama Supreme Court held that once the sentencer has found that a defendant has no "significant" history, that mitigating factor may not be qualified by the type of crimes the defendant has in fact committed. To do so would be contrary to the purpose of applying mitigating factors in favor of a convicted individual. Id.
We find Cook to offer no support to Foster in the instant case. The mitigating factor of which Foster complains was taken verbatim from the list provided by the legislature to be considered in imposing sentence. Further, Foster had the opportunity during closing arguments to dispel any notion the jury may have had that Foster had any history of criminal activity.
This assignment of error is rejected as being without merit.

XXIV.

THE JURY DID NOT LIST THE MITIGATING FACTORS WHICH IT FOUND TO BE PRESENT VIOLATING THE DEFENDANT'S RIGHTS SECURED UNDER MISSISSIPPI LAW AND THE U.S. CONSTITUTION.
Foster next contends he was entitled to have the jury provide a written list of all the mitigating circumstances it found in its deliberation of sentence, and that the failure of the jury to do so constitutes reversible error. Foster offers as his primary support Miss. Code Ann. § 99-19-101(3) (1972).
A review of that section indicates that in order to return a death sentence the jury must find that mitigating factors are insufficient *1303 to outweigh the existing aggravating circumstances. There is no authority for Foster's claim that he is entitled to have any mitigating circumstances the jury may have considered individually listed. The sentence of the jury in the instant case complied in all respects with the requirements of law in this state as provided by Miss. Code Ann. §§ 99-19-101 and 99-19-103 (1972). Accordingly, we find no merit to this assignment of error.

XXV.

THE CUMULATIVE ERROR IN THIS CASE REQUIRES A REVERSAL IN FOSTER'S DEATH SENTENCE.
Foster suggests that even if this Court declines to find reversible error in any one of Foster's sentencing assignments, he is entitled to a resentencing under the doctrine of cumulative error. Griffin v. State, 557 So.2d 542, 552-54 (Miss. 1990) (improper voir dire, introduction of victim-impact material and defective closing argument amounted to cumulative error requiring vacation of sentence and remand for new trial); Stringer v. State, 500 So.2d 928, 946 (Miss. 1986) (improper voir dire, a defective closing argument and wrongful admission of irrelevant photographs comprised a series of "near-errors" which "effectively killed any chance that Stringer could receive a fundamentally fair sentencing trial[.]") Foster argues that what this Court may consider harmless error in a non-capital case could be found to be reversible error under the heightened review required in a capital case. Irving v. State, 361 So.2d 1360, 1363 (Miss. 1978), cert. denied, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979).
However, Foster does not provide a listing of the "near errors" he found in the record. We are left to create this list ourselves. As previously discussed under the individual propositions, no reversible error was committed in the trial of this case. We find no "near errors" in either phase of this trial, so we find no cumulative error. Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir.1987) (Court of Appeals rejected argument that even if no individual claim entitles petitioner to relief, the claims collectively do, and found that "twenty times zero equals zero").
We find no merit to this issue by Foster.

XXVI.

THE DEATH SENTENCE IS DISPROPORTIONATE IN THIS CASE.
In accordance with Miss. Code Ann. Section 99-19-105(3)(c), this Court must review the record in this case and compare it with other capital murder cases in which this Court has entered judgment since Jackson v. State, 337 So.2d 1242 (Miss. 1976).
Foster contends the imposition of the death penalty is disproportionately severe in his case. Foster cites his mental capacity and his age as primary mitigating factors which he contends lead to the conclusion that the death sentence is too great a punishment when the aggravating and mitigating circumstances are weighed against each other. Nixon v. State, 533 So.2d 1078, 1102 (Miss. 1987).
First, Foster cites Pinkney v. State, 538 So.2d 329 (Miss. 1988) for the proposition that "significant mental impairment" is a valid ground for holding the death sentence disproportionate in a particular case. In Pinkney, this Court, in affirming the death penalty, noted the appellant suffered from no mental incapacity. Foster points out that in the sentencing phase of his trial, his father testified that Foster dropped out of school in the eighth grade and that Foster twice suffered head injuries at the age of twelve. Despite such testimony, we fail to see where Foster has effectively distinguished his situation from that presented in Pinkney. Other than the testimony of his father, Foster presented no documented evidence indicating mental impairment. Indeed, a report from Whitfield detailed that, although Foster had a low I.Q., he had the ability to understand right from wrong and was not considered retarded.
Foster argues that in addition to being mentally disabled, his youth prevents him from being morally culpable for his crime. He states: "The more a defendant is mentally impaired, or the younger he or she is, the less mentally and morally culpable he *1304 is." As previously outlined in Assignments I and II, there is no constitutional barrier to imposing the death penalty on persons of Foster's age or even younger. In reviewing our previous death penalty cases we find the sentence not to be disproportionate to the sentence imposed in the present case. Foster has cited no cases which would lead us to a conclusion to the contrary.
This assignment of error is rejected as being without merit.
This court finds no reversible error in the sentencing phase of Foster's trial.

CONCLUSION
After a careful review under the standard of heightened scrutiny exacted by all death penalty cases, this Court finds that the record in the instant case indicates no basis for reversal of Foster's conviction or sentence. Both the verdict of guilt and the sentence of death imposed upon Ronald Chris Foster are supported by substantial evidence. Finding no error in either the guilt or the sentencing phase of this trial, this Court affirms both the conviction and the sentence of death.
CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH AFFIRMED. WEDNESDAY, JUNE 15, 1994, SET AS DATE OF EXECUTION OF SENTENCE IN THE MANNER PROVIDED BY LAW.
PRATHER, P.J., and PITTMAN and JAMES L. ROBERTS, Jr., JJ., concur.
DAN M. LEE, P.J., and McRAE, J., concur in results only.
HAWKINS, C.J., dissents with separate written opinion, joined by SULLIVAN and BANKS, JJ.
BANKS, J., dissents with separate written opinion joined by HAWKINS, C.J., and SULLIVAN, J.
HAWKINS, Chief Justice, dissenting:
I respectfully dissent as to sentencing.
Miss. Code Ann. § 99-19-105(2), (3) mandates this Court to "consider punishment" as well as any errors enumerated by way of appeal.
Consistent with the views I have expressed in Jones v. State, 602 So.2d 1170, 1176 (Miss. 1992); Holland v. State, 587 So.2d 848, 875 (Miss. 1991); Neal v. State, 451 So.2d 743, 764 (Miss. 1984); Edwards v. State, 441 So.2d 84, 92 (Miss. 1983); Tokman v. State, 435 So.2d 664 (Miss. 1983); and Leatherwood v. State, 435 So.2d 645 (Miss. 1983), I would affirm Foster's conviction, but remand this cause to the circuit court for modification of sentence to imprisonment for life. Miss. Code Ann. § 99-19-105(5)(b).
Because I am charged by statute specifically to consider the punishment in addition to any assignment of error, in view of Foster's age at the time of the commission of the crime, and the environment in which he lived, the penalty of death should not be imposed upon him, and I would so hold.
SULLIVAN and BANKS, JJ., join this opinion.
BANKS, Justice, dissenting:
For the reasons stated by Justices Hawkins, I agree that this case should be remanded for the imposition of a life sentence. Failing that, I believe that the trial court committed reversible error in the voir dire and that the sentence here imposed should be vacated and the case remanded for further proceedings.

I.

THE TRIAL COURT ERRED IN REFUSING TO ALLOW THE DEFENDANT TO QUESTION THE VENIRE ABOUT WHETHER THEY WOULD AUTOMATICALLY VOTE IN FAVOR OF THE DEATH PENALTY IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE 3 SECTIONS 26 AND 28 OF THE MISSISSIPPI CONSTITUTION AND MISS. CODE ANN. SECTION 13-5-69.
The Sixth Amendment to the United States Constitution provides that individuals accused of crimes "shall enjoy the right to a speedy and public trial, by an impartial jury *1305 of the State and district wherein the crime shall have been committed ..." U.S. Const. amend. VI. The Fourteenth Amendment bars the States from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Article 3, § 26 of the Mississippi Constitution provides:
In all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both, to demand the nature and cause of the accusation, to be confronted by the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and, in all prosecutions by indictment or information, a speedy and public trial by an impartial jury of the county where the offense was committed; ...
The Eighth Amendment to the United States Constitution and Article 3, § 28 of the Mississippi Constitution contain the Federal and State cruel and unusual punishment prohibitions noted above. To the end of selecting an impartial jury our legislature has promulgated law providing that,
[t]he parties or their attorneys in all jury trials shall have the right to question jurors who are being impaneled with reference to challenges for cause, and for peremptory challenges, and it shall not be necessary to propound the question through the presiding judge, but they may be asked by the attorneys or by litigants not represented by attorneys.
Miss. Code Ann. § 13-5-69 (1972) (Emphasis supplied.)
In the instant case, the following exchange took place during voir dire questioning by defense counsel:
DEFENSE COUNSEL: ... How many of you believe that if you find Chris guilty beyond a reasonable doubt of capital murder that he should be sentenced to death automatically?

BY THE COURT: That's not the law. I  I'm going to have to interpose my own objection. That is not the law. He will not be  and if you will answer that or ask that question properly I would allow that one also.
DEFENSE COUNSEL: May I approach the bench?
BY THE COURT: You may.
(The attorneys approach the bench, along with the court reporter, and the following occurred out of the hearing of the jurors:)
DEFENSE COUNSEL: Your Honor, I still think I still believe  did you object automatically for him?
BY THE COURT: I objected to you asking them whether or not they felt that the death penalty should be automatic if they found him guilty of capital murder. That is not the law of this state, and I will not allow that particular question.
DEFENSE COUNSEL: So then if I cut off the automatically part?
BY THE COURT: No, I didn't say that. You asked them if they found him guilty of capital murder did they feel that he should automatically get the death penalty. That is not the law of this state, and I will instruct them differently from that so I feel that you are voir diring the jury on matters that  or a matter that is improper. Let's move along. Thank you. You may proceed.
DEFENSE COUNSEL (to the veniremen): Do any of you believe that persons convicted of murder should be executed?
VENIRE: (NO RESPONSE)
DEFENSE COUNSEL: Is there anyone in this section here?
VENIREMEN: (Number 90, Jean Whaley, raised her hand)
DEFENSE COUNSEL: I have one hand back there.
BY JUROR: Number 90.
DEFENSE COUNSEL: Is there anyone on this outer parameter?
VENIRE: (NO RESPONSE)
DEFENSE COUNSEL: Anyone in this section?
BY A JUROR: I don't understand what you say murder.
BY THE COURT: That's a good point.
DEFENSE COUNSEL: The question was, do any of you believe that someone convicted of murder should be executed?
BY A JUROR: Do you mean has to be executed?

*1306 DEFENSE COUNSEL: No.
BY A JUROR: If there are extenuating circumstances 
DEFENSE COUNSEL: Okay. If you'd like to stand.
BY A JUROR: I'd like to hear the case before I make my decision.
DEFENSE COUNSEL: Thank you, ma'am.
BY THE COURT REPORTER: Your number, please, ma'am.
BY JUROR: 93.
BY THE COURT REPORTER: Thank you.
DEFENSE COUNSEL: Yes, sir.
BY A JUROR: 24. It depends on the evidence presented.
DEFENSE COUNSEL: Thank you. Anyone in this section?
VENIRE: (NO RESPONSE)
The United States Supreme Court recently decided under virtually the exact same set of factual set of circumstances that due process required an Illinois trial judge to allow defense counsel to ask veniremen if they would automatically vote for death if the defendant was found guilty of capital murder. Morgan v. Illinois, 504 U.S. ___-___, 112 S.Ct. 2222, 2234-35, 119 L.Ed.2d 492, 509 (1992). The Court noted:
A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.
504 U.S. at ___, 112 S.Ct. at 2229-30, 119 L.Ed.2d at 503. These precepts being so, the Court recognized that a logical corollary has to be that the defendant has the right to voir dire the jury on any such potential knee-jerk reactions to guilt. The Court said of this corollary precept:
Were voir dire not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would always impose death following conviction, his right not to be tried by such jurors would be rendered as nugatory and meaningless as the State's right, in the absence of questioning, to strike those who would never do so.
504 U.S. at ___, 112 S.Ct. at 2232, 119 L.Ed.2d at 506. (emphasis in original).
In Morgan, the Illinois Death Penalty Statute provided that if a capital defendant was found guilty of the crime, and the jury found at least one of ten enumerated aggravating factors to be present, the jury could sentence the defendant to death if they unanimously agreed that mitigating circumstances did not warrant a lesser penalty. 504 U.S. at ___, 112 S.Ct. at 2225-26, 119 L.Ed.2d at 498. During voir dire, defense counsel requested the trial court to ask the question, "If you found Derrick Morgan guilty, would you automatically vote to impose the death penalty no matter what the facts are?" 504 U.S. at ___, 112 S.Ct. at 2226-27, 119 L.Ed.2d at 499. The trial court refused to ask the question, stating that it had "asked the question in a different vein substantially in that nature." Id. The court had asked some of the potential jurors, "Would you follow my instructions on the law, even though you may not agree." Id. The United States Supreme Court held that the general "follow the law" question was not synonymous with the "automatic vote for death" question and did not have the same investigatory value. 504 U.S. at ___, 112 S.Ct. at 2232-34, 119 L.Ed.2d at 506-507. The Court observed:
Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law. [cite omitted.] It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death *1307 penalty would prevent him or her from doing so. A defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under such misconception.
Id.
The case at bar appears virtually identical to Morgan. Foster's attorney attempted to ask the question, "How many of you believe that if you find Chris guilty beyond a reasonable doubt of capital murder that he should be sentenced to death automatically?" The trial court prevented him from asking the question, because it said it would instruct the jury otherwise. The court apparently assumed that any juror who took the juror's oath would follow the court's instructions. Obviously, that is not necessarily true. Furthermore, the Supreme Court in Morgan effectually said that a juror's subjective views about whether he can follow the law cannot substitute for a defendant's probe for objective indicia of whether that juror would in fact be likely to follow the law.
Foster's counsel had to settle for asking the question, "Do any of you believe that persons convicted of murder should be executed?" Clearly, that is not as poignant a question. A venireman may not necessarily be struck for cause, simply because he believed murderers should be put to death, See Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851. It is possible he could put those personal views aside and follow the instructions of law given to him. It is the knee-jerk reaction, the precise point embodied in the "automatic vote for death" question, that gives rise to dismissal. Id. Moreover, Foster was entitled to explore for information useful to his intelligent exercise of peremptory challenges. Miss. Code Ann. § 13-5-69.
The majority suggests that the problem is that Foster's counsel did not properly phrase the question. It does not bother to inform us what the proper phraseology is. More importantly, it does not inform us of any rule that the question transgresses as phrased. Surely, voir dire questions are not required to be phrased as instructions. Nor is it a sufficient objection that it does not comport with intended instruction or is "an incorrect statement of the law." The question did not purport to be a statement of the law. It was intended to pry into jurors' thought processes, prejudices and biases. That a particular juror might exhibit a preconception at odds with the law is exactly what the lawyer wants and is entitled to know. Id. The trial court interposed its own objection and ruled on it erroneously. It provided absolutely no guidance as to phraseology that it would accept. Under these circumstances, I cannot agree with the majority that either the pronouncements of Morgan or our statutory voir dire procedures were complied with. Under the authority of Morgan and that of Jones v. State, 133 Miss. 684, 98 So. 150 (1923), I would reverse the sentence of death in this case.

II.

THE DEATH PENALTY FOR JUVENILES WITHOUT ANY PRIOR CRIMINAL RECORD OR WITHOUT ANY PARTICULARIZED FINDINGS BEING MADE BEFORE BEING TRANSFERRED TO STAND TRIAL AS AN ADULT VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE THREE, SECTION 28 OF THE MISSISSIPPI CONSTITUTION.
Foster was seventeen years of age at the time he is alleged to have robbed Hankins Superette in Columbus and killed the store clerk, George Shelton. He had no prior criminal convictions. Generally, the youth court has exclusive jurisdiction over criminal cases brought against defendants under the age of eighteen. See Miss. Code Ann. §§ 43-21-105(d) (Supp. 1992) and 43-21-151(1) (Supp. 1992). Where the youth court has such exclusive jurisdiction, juveniles may not be tried as adults unless the youth court, in its own discretion, decides to "transfer jurisdiction of the alleged offense ... or a lesser included offense to the criminal court which would have trial jurisdiction of such offense if committed by an adult." Miss. Code Ann. § 43-21-157 (Supp. 1992). Before it may transfer a juvenile for trial in the circuit courts, however, the youth court must first *1308 conduct a bifurcated hearing and: 1) "determine ... [that] probable cause exists to believe that the child committed the alleged offense;" and 2) find "by clear and convincing evidence that there are no reasonable prospects of rehabilitation within the juvenile system." Miss. Code Ann. § 43-21-157(3) and (4) (Supp. 1992). Section 43-21-157(5) enumerates the following factors as the criteria to be considered by the youth court in determining a child's reasonable prospects of rehabilitation within the juvenile justice system:
(a) Whether or not the alleged offense constituted a substantial danger to the public;
(b) The seriousness of the alleged offense;
(c) Whether or not the transfer is required to protect the community;
(d) Whether or not the alleged offense was committed in an aggressive, violent, premeditated or wilful manner;
(e) Whether the alleged offense was against persons or against property, greater weight being given to the offense against persons, especially if personal injury resulted;
(f) The sophistication, maturity and educational background of the child;
(g) The child's home situation, emotional condition, and lifestyle;
(h) The history of the child, including experience with the juvenile justice system, other courts, probation, commitments to juvenile institutions or other placements;
(i) Whether or not the child can be retained in the juvenile justice system long enough for effective treatment or rehabilitation;
(j) The dispositional resources available to the juvenile justice system;
(k) Dispositional resources available to the adult correctional system for the child if treated as an adult; and
(l) Any other factors deemed relevant by the court.
Under Mississippi law, these juvenile certification procedures do not take place if a child commits an act, "which if committed by an adult would be punishable under state or federal law by life imprisonment or death," Miss. Code Ann. 43-21-151(1) (Supp. 1992), because original jurisdiction is vested in the circuit courts under such circumstances. In addition, juveniles who commit capital offenses become automatically eligible for the death sentence, because Mississippi law places no minimum age limit on the imposition of the death penalty. See Miss. Code Ann. § 99-19-101 (1972). Thus, in the instant case, §§ 43-21-151(1) and 99-19-101 of the Code combined to allow Foster, 17 at the time of his offense, to be tried and convicted of a capital offense and receive the death sentence, without there ever having been a preliminary determination that he should be tried as an adult, and despite the fact he had no prior criminal convictions.
Foster argues this process violates the 8th Amendment prohibition against cruel and unusual punishment under the precedent of Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), Wilkins v. Missouri, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), and Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988). He also contends the analogous prohibition contained in article 3, § 28 of the Mississippi Constitution has been violated.
The Eighth Amendment to the United States Constitution mandates that "cruel and unusual punishments" shall not be inflicted. The Eighth Amendment prohibitions have been made applicable to the states through the fourteenth amendment to the United States Constitution. Article 3, § 28 of the Mississippi Constitution forbids the infliction of "cruel or unusual punishment."[1] The United States Supreme Court has already *1309 decided through the cases of Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), and Wilkins v. Missouri, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) that sentencing a fifteen year-old offender to death is per se cruel and unusual punishment, Thompson, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702, and imposing the death penalty on a sixteen or seventeen year-old offender does not constitute such a per se violation. Stanford and Wilkins, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306.
In Thompson, Justice Stevens wrote for a plurality including Justices Brennan, Marshall and Blackmun. Justice O'Connor concurred in the judgment. The Thompson plurality was drawn to its ultimate conclusion by a belief that sentencing fifteen year-old offenders to death would offend civilized standards of decency. 487 U.S. 815, 838, 108 S.Ct. 2687, 2700, 101 L.Ed.2d 702, 720. They confirmed their belief by considering state and federal legislative enactments, statistical evidence as to behavior of juries, and the principle that less culpability should attach to crimes committed by juveniles. Stanford and Wilkins were presented together. The Stanford and Wilkins defendants were seventeen and sixteen, respectively, when they committed their offenses. A plurality of the Court, Justices Scalia, Rehnquist, White, and Kennedy, did not believe a national consensus could be discerned against imposing the death sentence on sixteen or seventeen defendants. 492 U.S. 361, 380, 109 S.Ct. 2969, 2980-81, 106 L.Ed.2d 306, 325. Justice O'Connor concurred in this conclusion. Id.
In the case at bar, Foster is not questioning whether his age of time of his offense  seventeen  renders him per se ineligible for the death penalty. He, instead, raises the first-impression claim that Eighth Amendment proportionality strictures require that, before a juvenile offender can be tried as an adult and sentenced to death, a pretrial judicial inquiry considering the defendant's individual circumstances must be conducted to determine whether the defendant should be tried and sentenced as an adult offender. Foster contends, moreover, that had such a procedure been undertaken in his case, his lack of a criminal history would have militated against a clear and convincing finding that he had "no reasonable prospects of rehabilitation within the juvenile system", as required by Mississippi's certification statute. See Miss. Code Ann. § 43-21-157(4) (Supp. 1992).
Certification procedures were undertaken in both Stanford and Wilkins. In both cases, the Supreme Court, in upholding the death sentences imposed, placed emphasis on the existence of those certification procedures and the findings drawn from them by the State court judges. The Supreme Court noted, "[T]he determinations required by juvenile transfer statutes to certify a juvenile for trial as an adult ensure individualized consideration of the maturity and moral responsibility of 16- and 17-year-old offenders before they are even held to stand trial as adults." 492 U.S. at 375, 109 S.Ct. at 2978, 106 L.Ed.2d at 322. The Court also noted that, in accordance with Kentucky law, the Kentucky juvenile court conducted a certification hearing concerning defendant Stanford and found certification for trial as an adult to be in the best interests of Stanford and the State, "[s]tressing the seriousness of [Stanford's] offenses and the unsuccessful attempts of the juvenile system to treat him for numerous instances of past delinquency." 492 U.S. at 367, 109 S.Ct. at 2974, 106 L.Ed.2d at 316. With respect to defendant Wilkins, the Court observed, "Relying on the `viciousness, force, and violence' of the alleged crime, petitioner's maturity, and the failure of the juvenile system to rehabilitate him after previous delinquent acts, the juvenile court made the necessary certification." Id. Wilkins "had been in and out of juvenile facilities since the age of eight for various acts of burglary, theft, and arson, had attempted to kill his mother by putting insecticide into Tylenol capsules, and had killed several animals in his neighborhood." 492 U.S. at 367, 109 S.Ct. at 2974, 106 L.Ed.2d at 317.
Despite the emphasis the Stanford Court placed on certification procedures and findings, no procedural challenge concerning certification was before the Court, and the *1310 Court never explicitly and unequivocally declared that individualized certification findings are constitutionally required for juveniles charged with capital offenses. Nevertheless, the views of at least a majority of the Court on this issue can be discerned from the positions they expressed in Stanford and Thompson.
Justices Stevens and Blackmun joined Justices Brennan and Marshall on the Thompson plurality that declared that sentencing fifteen-year-old offenders to death per se was a violation of the Eighth Amendment "cruel and unusual" punishment clause. In that case, the plurality restricted their judgment to fifteen-year-old offenders for the expressed reason that imposition of the death penalty on older juveniles was not presented to them at that time. 487 U.S. at 838, 108 S.Ct. at 2700, 101 L.Ed.2d at 720. The Court was presented with such scenarios shortly thereafter in Stanford and Wilkins; and there, Justices Blackmun and Stevens, along with Justice Marshall, joined Justice Brennan in proclaiming, "I believe that to take the life of a person as punishment for a crime committed when below the age of 18 is cruel and unusual and hence is prohibited by the Eighth Amendment." 492 U.S. at 382, 109 S.Ct. at 2982, 106 L.Ed.2d at 326. From these expressed opinions, it is clear that Justices Stevens and Blackmun, who absolutely disfavor putting juveniles to death, would require at a minimum a prerequisite that juveniles be certified as sufficiently mature, morally responsible and lacking in rehabilitative potential before they be put to death.
The positions of Justice Scalia, Rehnquist, White also appear cognizable. In Thompson, they dissented, saying in part:
If the issue before us today were whether an automatic death penalty for conviction of certain crimes could be extended to individuals younger than 16 when they commit the crimes, thereby preventing individualized consideration of their maturity and moral responsibility, I would accept the plurality's conclusion that such a practice is opposed by a national consensus, sufficiently uniform and of sufficiently long standing, to render it cruel and unusual punishment within the meaning of the Eight Amendment. We have already decided as much, and more, in Lockett v. Ohio, 438 U.S. 586, 57 L.Ed.2d 973, 98 S.Ct. 2954 (1978). I might even agree with the plurality's conclusion if the question were whether a person under 16 when he commits a crime can be deprived of the benefit of a rebuttable presumption that he is not mature and responsible enough to be punished as an adult. The question posed here, however, is radically different from both of these.
487 U.S. at 859, 108 S.Ct. at 2711-12, 101 L.Ed.2d at 735. These three justices expressed the opinion of the Court in Stanford and said there that juvenile certification determinations serve to "ensure individualized consideration of the maturity and moral responsibility of 16- and 17-year-old offenders[2]." 492 U.S. at 375, 109 S.Ct. at 2978, 106 L.Ed.2d at 322. These two statements taken together seem to be strong indicia that Justices Scalia, Rehnquist, and White also perceive individualized certification determinations as necessary to protect the Eighth Amendment rights of juvenile capital defendants.
Justice O'Connor wrote concurrences in both Thompson and Stanford. Her concurrences reflect a three-tiered analytical model that assesses Eighth Amendment proportionality on a group rather than individual level. It focuses on whether the scheme under which a death sentence has been imposed reflects a conscious decision by the legislature of that State to sanction capital punishment for individuals of the subject age and whether such capital punishment is contrary to a manifest will of the nation's citizenry that individuals of the subject age not be sentenced to death. See Stanford, 492 U.S. at 380-381, 109 S.Ct. at 2980-81, 106 L.Ed.2d at 325; Thompson, 487 U.S. at 857, 108 S.Ct. at 2710-11, 101 L.Ed.2d at 734. Therefore, given the focus of her analysis Stanford and Thompson, her concurrences in those cases *1311 do not shed much light on the position she would likely take on the procedural issue presented in the case at bar. The positions of the remaining three Justices are also difficult to assess. Justice Kennedy did not participate in Thompson, and Justices Souter and Thomas were not yet on the Court. Notwithstanding the uncertainty regarding these four Justices, it appears probable that Justices Blackmun, Stevens, White, Scalia, and Rehnquist, a majority of the Court, would pronounce that Eighth Amendments strictures demand that juveniles be certified before being tried as adults and sentenced to death. That is a reasoned approach to cases of this kind and it is likely to resurface.
I would pretermit extended post-conviction proceedings on this issue and adopt a requirement in this case that the trial court sua sponte engage in the statutory assessment before proceeding to a capital trial of one under the age of 18.
HAWKINS, C.J., and SULLIVAN, J., join this dissent.

APPENDIX

DEATH CASES AFFIRMED BY THIS COURT
Hansen v. State, 592 So.2d 114 (Miss. 1991).
[*]Shell v. State, 554 So.2d 887 (Miss. 1989), Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding, Shell v. State, 595 So.2d 1323 (Miss. 1992) remanding for new sentencing hearing.
Davis v. State, 551 So.2d 165 (Miss. 1989).
Minnick v. State, 551 So.2d 77 (Miss. 1989).
[*]Pinkney v. State, 538 So.2d 329 (Miss. 1989), Pinkney v. Mississippi, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding, Pinkney v. State, 602 So.2d 1177 (Miss. 1992) remanding for new sentencing hearing.
[*]Clemons v. State, 535 So.2d 1354 (Miss. 1988), Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding, Clemons v. State, 593 So.2d 1004 (Miss. 1992) remanding for new sentencing hearing.
Woodward v. State, 533 So.2d 418 (Miss. 1988).
Nixon v. State, 533 So.2d 1078 (Miss. 1987).
Cole v. State, 525 So.2d 365 (Miss. 1987).
Lockett v. State, 517 So.2d 1346 (Miss. 1987).
Lockett v. State, 517 So.2d 1317 (Miss. 1987).
Faraga v. State, 514 So.2d 295 (Miss. 1987).
[*]Jones v. State, 517 So.2d 1295 (Miss. 1987), Jones v. Mississippi, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) vacating and remanding, Jones v. State, 602 So.2d 1170 (Miss. 1992) remanding for new sentencing hearing.
Wiley v. State, 484 So.2d 339 (Miss. 1986).
Johnson v. State, 477 So.2d 196 (Miss. 1985).
Gray v. State, 472 So.2d 409 (Miss. 1985).
Cabello v. State, 471 So.2d 332 (Miss. 1985).
Jordan v. State, 464 So.2d 475 (Miss. 1985).
Wilcher v. State, 455 So.2d 727 (Miss. 1984).
Billiot v. State, 454 So.2d 445 (Miss. 1984).
Stringer v. State, 454 So.2d 468 (Miss. 1984).
Dufour v. State, 453 So.2d 337 (Miss. 1984).
Neal v. State, 451 So.2d 743 (Miss. 1984).
Booker v. State, 449 So.2d 209 (Miss. 1984).
Wilcher v. State, 448 So.2d 927 (Miss. 1984).
Caldwell v. State, 443 So.2d 806 (Miss. 1983).
Irving v. State, 441 So.2d 846 (Miss. 1983).
Tokman v. State, 435 So.2d 664 (Miss. 1983).
Leatherwood v. State, 435 So.2d 645 (Miss. 1983).
Hill v. State, 432 So.2d 427 (Miss. 1983).
Pruett v. State, 431 So.2d 1101 (Miss. 1983).
Gilliard v. State, 428 So.2d 576 (Miss. 1983).
Evans v. State, 422 So.2d 737 (Miss. 1982).
King v. State, 421 So.2d 1009 (Miss. 1982).
Wheat v. State, 420 So.2d 229 (Miss. 1982).
Smith v. State, 419 So.2d 563 (Miss. 1982).
*1312 Johnson v. State, 416 So.2d 383 (Miss. 1982).
Edwards v. State, 413 So.2d 1007 (Miss. 1982).
Bullock v. State, 391 So.2d 601 (Miss. 1980).
Reddix v. State, 381 So.2d 999 (Miss. 1980).
Jones v. State, 381 So.2d 983 (Miss. 1980).
Culberson v. State, 379 So.2d 499 (Miss. 1979).
Gray v. State, 375 So.2d 994 (Miss. 1979).
Jordan v. State, 365 So.2d 1198 (Miss. 1978).
Voyles v. State, 362 So.2d 1236 (Miss. 1978).
Irving v. State, 361 So.2d 1360 (Miss. 1978).
Washington v. State, 361 So.2d 61 (Miss. 1978).
Bell v. State, 360 So.2d 1206 (Miss. 1978).

DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE
Butler v. State, 608 So.2d 314 (Miss. 1992).
Jenkins v. State, 607 So.2d 1171 (Miss. 1992).
Abram v. State, 606 So.2d 1015 (Miss. 1992).
Balfour v. State, 598 So.2d 731 (Miss. 1992).
Griffin v. State, 557 So.2d 542 (Miss. 1990).
Bevill v. State, 556 So.2d 699 (Miss. 1990).
West v. State, 553 So.2d 8 (Miss. 1989).
Leatherwood v. State, 548 So.2d 389 (Miss. 1989).
Mease v. State, 539 So.2d 1324 (Miss. 1989).
Houston v. State, 531 So.2d 598 (Miss. 1988).
West v. State, 519 So.2d 418 (Miss. 1988).
Davis v. State, 512 So.2d 1291 (Miss. 1987).
Williamson v. State, 512 So.2d 868 (Miss. 1987).
Foster v. State, 508 So.2d 1111 (Miss. 1987).
Smith v. State, 499 So.2d 750 (Miss. 1986).
West v. State, 485 So.2d 681 (Miss. 1985).
Fisher v. State, 481 So.2d 203 (Miss. 1985).
Johnson v. State, 476 So.2d 1195 (Miss. 1985).
Fuselier v. State, 468 So.2d 45 (Miss. 1985).
West v. State, 463 So.2d 1048 (Miss. 1985).
Jones v. State, 461 So.2d 686 (Miss. 1984).
Moffett v. State, 456 So.2d 714 (Miss. 1984).
Lanier v. State, 450 So.2d 69 (Miss. 1984).
Laney v. State, 421 So.2d 1216 (Miss. 1982).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT
Reddix v. State, 547 So.2d 792 (Miss. 1989).
Wheeler v. State, 536 So.2d 1341 (Miss. 1988).
White v. State, 532 So.2d 1207 (Miss. 1988).
Bullock v. State, 525 So.2d 764 (Miss. 1987).
Edwards v. State, 441 So.2d 84 (Miss. 1983).
Dycus v. State, 440 So.2d 246 (Miss. 1983).
Coleman v. State, 378 So.2d 640 (Miss. 1979).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY
[*]Shell v. State, 554 So.2d 887 (Miss. 1989), Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding, Shell v. State, 595 So.2d 1323 (Miss. 1992) remanding for new sentencing hearing.
[*]Pinkney v. State, 538 So.2d 329 (Miss. 1989), Pinkney v. Mississippi, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding, Pinkney v. State, 602 So.2d 1177 (Miss. 1992) remanding for new sentencing hearing.
[*]Clemons v. State, 535 So.2d 1354 (Miss. 1988), Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding, Clemons v. State, 593 So.2d 1004 (Miss. 1992) remanding for new sentencing hearing.
[*]Jones v. State, 517 So.2d 1295 (Miss. 1987), Jones v. Mississippi, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) *1313 vacating and remanding, Jones v. State, 602 So.2d 1170 (Miss. 1992) remanding for new sentencing hearing.
Russell v. State, 607 So.2d 1107 (Miss. 1992).
Holland v. State, 587 So.2d 848 (Miss. 1991).
Willie v. State, 585 So.2d 660 (Miss. 1991).
Ladner v. State, 584 So.2d 743 (Miss. 1991).
Mackbee v. State, 575 So.2d 16 (Miss. 1990).
Berry v. State, 575 So.2d 1 (Miss. 1990).
Turner v. State, 573 So.2d 657 (Miss. 1990).
State v. Tokman, 564 So.2d 1339 (Miss. 1990).
Johnson v. State, 547 So.2d 59 (Miss. 1989).
Williams v. State, 544 So.2d 782 (Miss. 1987).
Lanier v. State, 533 So.2d 473 (Miss. 1988).
Stringer v. State, 500 So.2d 928 (Miss. 1986).
Pinkton v. State, 481 So.2d 306 (Miss. 1985).
Mhoon v. State, 464 So.2d 77 (Miss. 1985).
Cannaday v. State, 455 So.2d 713 (Miss. 1984).
Wiley v. State, 449 So.2d 756 (Miss. 1984).
Williams v. State, 445 So.2d 798 (Miss. 1984).
NOTES
[1] The closing argument in Garza is strikingly opprobrious. The defendant raised an alibi defense, calling a number of witnesses to testify. Garza, 608 F.2d at 661. The case for the U.S. rested primarily on the testimony of a c.i. and a D.E.A. agent. Id. The prosecutor peppered his closing with comments to the effect that (1) he believed the U.S. witnesses over the defense witnesses; (2) that he would not have called the U.S. witnesses if he did not believe they were telling the truth; (3) the U.S. witnesses have no reason to lie; (4) that neither he nor the U.S. Government would frame the defendant. 608 F.2d at 661-663.
[2] Appellant argues that the developments in "cruel and unusual punishment" jurisprudence articulated in Stanford and Thompson also apply to the Mississippi constitutional provision, as those developments announce general principles regarding what is "cruel and unusual." In addition, appellant argues that the use of the disjunctive "or" in the Mississippi provision as opposed to the conjunctive "and" in the federal amendment indicates that the Mississippi provision is intended to be applied on a more far-reaching level than the federal "cruel and unusual punishment" clause.
[3] Foster was convicted and sentenced in January 1991. Willie v. State was handed down in July 1991.
[1] Appellant argues that the developments in "cruel and unusual punishment" jurisprudence articulated in Stanford and Thompson also apply to the Mississippi constitutional provision, as those developments announce general principles regarding what is "cruel and unusual." In addition, Appellant argues that the use of the disjunctive "or" in the Mississippi provision as opposed to the conjunctive "and" in the federal amendment indicates that the Mississippi provision is intended to be applied on a more far-reaching level than the federal "cruel and unusual punishment" clause.
[2] Of course, this proposition would apply to certification proceedings for defendants of any age. The Court just happened to be addressing concerns specifically with respect the two defendants before the Court, who were 16 and 17 years old, respectively.
[*] Case was originally affirmed in this Court but on remand from U.S. Supreme Court, case was remanded by this Court for a new sentencing hearing.